[Sac. No. 2649. In Bank.—December 18, 1917.]

## J. A. MURRAY, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

APPEAL—ORDER DENYING NEW TRIAL—REVIEW—PENDENCY OF MOTION WHEN STATUTE AMENDED.—Where a motion for a new trial was pending when the right of appeal from an order denying a new trial was abrogated by the amendment to section 963 of the Code of Civil Procedure (Stats. 1915, p. 209), an order denying such motion may be reviewed upon the record upon which the motion for a new trial was made.

NEGLIGENCE—QUESTION OF LAW OR FACT—GENERAL RULE—CONFLICT OF EVIDENCE.—The general rule applicable to negligence cases is that, even where there is no conflict in the evidence, negligence is a question of fact for the jury if different conclusions upon the matter can rationally be drawn from the evidence, but if but one conclusion can reasonably be reached from the evidence, it is a question of law for the court.

ID.—RAILROAD—ACCIDENT AT CROSSING—COLLISION WITH AUTOMOBILE—CONTRIBUTORY NEGLIGENCE OF AUTOMOBILE DRIVER.—The driver of an automobile damaged at a railroad crossing, who lived near and was familiar with the crossing and its surroundings and knew that a number of accidents, some fatal to human life, had occurred to persons attempting to pass over it, and whose full view of a siding, to one side, on approaching the crossing, was obstructed by a building, and who did not stop his machine, alight and go to a point from which he could have had an unobstructed view of the entire length of the siding beyond the corner of the obstructing building, failed, by his own act of negligence, to avail himself of a position where he could have used his faculties of observation to advantage, and thus failed to exercise ordinary care in attempting to cross the defendant's railroad tracks, and under such circumstances the plaintiff, owner of the automobile, had no legal ground for claiming compensatory damages.

CLXXVII Cal.—1      (1)

APPEAL from a judgment of the Superior Court of Yolo County, and from an order denying a new trial. W. A. Anderson, Judge.

The facts are stated in the opinion of the court.

Hudson Grant, and Devlin & Devlin, for Appellant.

A. G. Bailey, A. C. Murray, and Geo. Clark, for Respondent.

THE COURT.—Before the court of appeal, which had original jurisdiction of this case, the following decision was rendered by Hart, J.:

"This is an action for damages for injuries alleged to have resulted to an automobile owned by the plaintiff from the negligence of the defendant.

"The accident resulting in the alleged damage to the automobile occurred at Woodland, Yolo County, between the hours of 8 and 9 o'clock in the morning of August 26, 1914. The complaint states that the automobile was a Westcott four-passenger machine of the value of $925, and alleges that on the day mentioned, 'while said machine was in charge of and under the direction of the plaintiff's agent, and while said automobile was proceeding eastward, with due care, along Court Street in the city of Woodland . . . across the [railroad] tracks of the said defendant, and which said tracks cross the east end of said Court Street at right angles, the said defendant, without any care, and without ringing a bell or blowing a whistle, and without any warning whatever, and by reason of its negligence and the negligent operation of one of its locomotives, caused one of defendant's locomotives to come in collision with said automobile, thereby smashing, wrecking and destroying said automobile, and thereby causing said automobile to be damaged, wrecked and destroyed.'

"Judgment for the sum of $925, the alleged value of said machine, was prayed for.

"The answer specifically denies the allegations of the complaint, and, furthermore, charges that the injuries resulting to the plaintiff's automobile were proximately caused wholly by the negligence of plaintiff's agent, in charge of and driving said machine at the time of the alleged collision, and fur-

ther charges that the plaintiff's said agent, when at a point
of safety, did not stop or look and listen for the approach
of a train, nor exercise ordinary care in approaching said
crossing; 'that had said agent stopped or looked or listened
he would have discovered and known of the approach of said
locomotive which it is alleged caused the injury to plaintiff's
automobile,' etc.

"The cause was tried by a jury and a verdict awarding the
plaintiff damages in the sum of three hundred dollars re-
turned. Judgment was entered accordingly.

"The defendant appeals from said judgment and the order
denying it a new trial.

"The motion for a new trial was pending prior to August 8,
1915, the time at which the law abrogating appeals from or-
ders denying new trials (Stats. 1915, p. 209) went into effect,
and, therefore, the said order in this case may be reviewed
upon the record upon which the motion for a new trial was
made. (*Schmitt* v. *White,* 172 Cal. 554, [158 Pac. 216].)

"The appellant complains here of the action of the trial
court in admitting, over its objection, certain testimony and
in reading to the jury certain instructions. It is also claimed
that the evidence does not support the verdict, in that thereby
it is made clearly to appear that the accident causing the
damage to the plaintiff's automobile was brought about solely
through the inexcusable and negligent conduct of the driver
of the machine.

"The testimony upon which the verdict was, obviously, prin-
cipally founded was that given by Earl Murray, son of the
plaintiff, and who was the driver of the machine when the
accident happened. In fact, as to the immediate circum-
stances of the collision, his was the only testimony given for
the plaintiff. We may, therefore, state in narrative form
the facts as he detailed them to the jury. It will be the more
orderly, however, first to describe the physical surroundings
of the scene of the misadventure.

"Court Street is one of the principal streets of the city of
Woodland, and runs in an easterly and westerly direction
and is crossed by the tracks of the defendant railroad com-
pany. The city proper or the business and principal por-
tion thereof lies on the west side of said tracks. On the
northwest corner of Court Street and the railroad crossing

is situated the building of the Woodland Grain and Milling Company. In said building, and on the east side thereof, there are two doors. One of these is situated at approximately twenty-one feet from the southeast corner of the building and the other about seventy-seven feet from said corner and north of the former. The west line of the main tracks of the defendant's railway is located about forty-four feet east of the east line of said building. These tracks constitute a part of the main line of the California and Oregon division of the defendant's system, and are also used by the defendant for its traffic between local points in this state north of the city of Woodland and the cities of Sacramento and San Francisco.

"A siding or switch track is located and runs along the east side of the mill building and at an average of six and a half feet from and along the east line thereof. This siding was apparently so located and is being so maintained for the special convenience of the business of the Milling Company as well as that of the defendant in the matter of the transportation of the former's freight.

"Earl Murray, the driver of the automobile, was living, and for some six or seven years prior to the time of the accident had lived, at 947 Court Street, which is about two blocks from the railroad crossing above referred to. He was familiar with the crossing and its surroundings. He knew (so he said) that it was a dangerous crossing and that a number of accidents, some fatal to human life, had occurred to persons attempting to pass over it.

"On the day the accident happened, which, as above stated, was the twenty-sixth day of August, 1914, and between the hours of 8 and 9 A. M., he started with the plaintiff's Westcott machine from his home to go to his ranch, which is situated about five and a half miles southeast of Woodland, traveling in an easterly direction and toward the railroad crossing. According to his story, upon approaching the crossing, he slackened the speed of the machine so that he was then traveling at the rate of between two and three miles per hour. When he reached a point in the street opposite the mill, he observed a freight engine on one of the main tracks going in a southerly direction. After this engine had passed him, he looked south to see whether it was going to

return.  Satisfying himself that it would not return, he then looked in a northerly direction to see if there was another engine or a train coming from that direction.  At this point of time—that is, when he turned his eyes to the north—the front end of his machine was about six feet from the west rail of the siding, and from where he sat in the machine the distance to the said west rail was from fifteen to eighteen feet, it being six feet from the front part of the seat to the front end of the machine.  From this point he could not, on account of the mill, see farther north than a distance of some fifteen or eighteen feet.  He saw no cars or engine north of him.  He heard from the north no warning of any kind, such as the blowing of a whistle or the ringing of a bell or escaping steam or the noise ordinarily made by a locomotive passing over a track, notwithstanding (so he declared) he 'listened carefully.'  He did, however, hear a 'rumbling noise' from and the ringing of the bell on the engine which had just passed him going southward.  He proceeded on and had just reached and was crossing the west rail of the side track when a locomotive, which, according to the testimony of the trainmen, had a few moments previously backed a freight-car up to the north door of the mill, appeared at the south corner of the building, going south.  Murray, then observing the engine for the first time, stopped his machine as quickly as he could and threw on the reverse.  He had barely started to reverse when the engine struck about two feet of the front end of the automobile.  The locomotive struck the machine with such force that the impact threw the rear end of the machine underneath the drive wheels of the engine. The machine was, of course, greatly damaged.

"On cross-examination, Earl Murray testified that from where he was sitting in the machine at the time he 'slowed down' on approaching the crossing, which was a distance of approximately 'fifteen or sixteen feet from the tracks,' he could not, when looking north past the south corner of the mill building, have seen the tender of the engine on the siding at a greater distance than from twenty to twenty-five feet beyond said corner.  'I looked from that point and didn't see anything,' he said.  'It is not a fact that if I had stopped when the seat of my auto was just opposite the southeast corner of the mill building that my machine would have

still cleared. It isn't a fact that I could have stopped fifteen feet from the rail and still have seen more than twenty feet past the corner. I went down and tried it. The mill building obstructed my view. I knew the mill building was there when I looked. I knew it was there when I started toward the crossing. I didn't stop my machine.' Further testifying on cross, he said: 'I was watching a car going the other way because it had just crossed the crossing and I wanted to see if it was coming back. . . . I was concerned with that engine. I looked to see if it was not going to run into me; it attracted my attention; I looked back that way the second time after I looked up—at the train that was a block and a half away—to see whether it was coming my way and at the time I last saw, it was going the other way.'

"The witness, Morse, an employee of the milling company, was in the building at the time of the collision. He saw the wrecked automobile from a window on the Court Street side of the building immediately after the collision. He was then a distance of from twenty-five to thirty-five feet from the side track of the defendant. He testified that he did not hear a bell ringing at or immediately previous to that time. He said that he did not know 'that there was an engine on that track.'

"The foregoing comprehends a statement, substantially, of the facts brought out by the plaintiff.

"On the close of the plaintiff's case, the defendant moved for a nonsuit, but the motion was denied.

"We think the motion should have been granted, as, to our minds, it is clearly manifest that the plaintiff's agent—the driver of the automobile—did not, in attempting to make the crossing, exercise ordinary care.

"It is proper at this point to state that no evidence was introduced by the defendant in any manner supplying proof of negligence by its agent or of the want of negligence on the part of the driver of the automobile. The plaintiff's case, therefore, rests wholly upon the testimony of the witness, Earl Murray.

"The general rule applicable to negligence cases may be stated to be: That, even when there is no conflict in the evidence, negligence is a question of fact for the jury, if different conclusions upon the matter can rationally be drawn from the evidence (*Fernandes* v. *Sacramento etc. R. R. Co.*,

52 Cal. 45; *McKeever* v. *Market St. R. R. Co.*, 59 Cal. 294; *Chidester* v. *Consolidated D. Co.,* 59 Cal. 197; *House* v. *Meyer*, 100 Cal. 592, [35 Pac. 308]); but if but one conclusion can reasonably be reached from the evidence, it is a question of law for the court.

''In this case the driver was, according to his own testimony, thoroughly familiar with the crossing and its surroundings. He knew that it was a dangerous place to pass over with an automobile or other vehicle. He knew of the existence of the switch-track running alongside the mill building. Knowing these facts, he, upon approaching the crossing, slackened the speed of the automobile to the rate of between two and three miles an hour, and in this connection it may be observed that at that rate of speed he could easily have stopped his machine within a distance of three feet. But his fundamental fault lay in his not exercising proper or ordinary care in ascertaining whether there was an engine or train prepared for action on the side-track north of and beyond the southeast corner of the building. He said that from the point at which he slackened the speed of the machine—some fifteen or eighteen feet of the crossing or the west rail of the side track—he could see no farther than fifteen or eighteen feet beyond the corner of the building north; that he then looked north and that he saw no engine; that he proceeded on and when about crossing the west rail of the siding he first saw the engine coming toward him and then so near his machine that he was unable to reverse it so as to clear the rail before the engine reached him.

''Either one of three different theories only upon which the accident may be accounted for may consistently be deduced from his testimony, viz.: 1. That he did not look north at all, his attention being wholly occupied by the locomotive which had just passed him going south, a theory which is to some extent supported by his statement during his testimony that he was concerned with the engine going south, and that twice he looked in that direction to see if that locomotive was returning or preparing to return toward the crossing; 2. That, if he did look north at the point where first he 'slowed down' the machine, he was then so situated with reference to the mill building that his view was thereby so obstructed that he could not have seen the engine on the siding near

the point where the north door of the building is situated, from which point it returned south; 3. That the first time he looked to the north, if at all, was when the locomotive was within a few feet of his machine at a point south of the corner of the building.

"It is immaterial which of the three theories above suggested is the correct one, for in either the result is the same, the driver being himself entirely to blame for the mishap.

"But, in reaching our conclusion, we have assumed that he was correct in saying that he did look north from the point from which he said he could not see the siding a greater distance than fifteen or eighteen feet beyond the corner of the building. It was his duty, knowing what he did of the inherent dangers of the situation into which he was about to place himself, to first stop, look, and listen, and so ascertain with certainty that there was no engine or train approaching or likely to approach while he was in the act of making the crossing. If the mill building obstructed a full view of the siding to the north end thereof from the point at which he said he looked north and beyond which he said he could not have moved his machine without being struck by the part of the engine projecting over and beyond the west rail, then he should have stopped his machine, alighted and himself gone to a point from which he could have had an unobstructed view of the entire length of the siding north of the corner of the mill. This he failed to do, according to his own testimony, but proceeded on upon the assumption that, having seen no engine as far as he was able to see the siding beyond the corner of the mill building, there was none on the track. Under all the circumstances and conditions existing, and with which he was perfectly familiar, he had no right to so assume.

"In *Herbert* v. *Southern Pac. Co.*, 121 Cal. 227, 230, [53 Pac. 651], it is said: 'The railroad track of a steam railway must itself be regarded as a sign of danger, and one intending to cross must avail himself of every opportunity to look and to listen for approaching trains. What he must do in such a case will depend upon circumstances. If the view of the track is obstructed he should take greater pains to listen. If, taking these precautions, he would have seen or heard the approaching train, the very fact of injury will raise a presumption that he did not take the required precautions.'

"In *Green* v. *Southern Cal. Ry. Co.* 138 Cal. 1, [70 Pac. 926], the court makes the following declaration, which is peculiarly applicable to the conduct of the plaintiff's agent here in proceeding to pass over the crossing without looking farther north along the side-track than the distance of fifteen or eighteen feet beyond which his view was obstructed by the mill: 'The fact that they looked to the east as they passed the gate, or opening, farther up the street, as above noted, which was of little benefit to them, is no excuse for not looking or listening at points near the track where such looking would have been effective.'

"So here, the fact that the agent of the plaintiff did not, because he could not on account of the building obstructing his view, look farther up the side-track beyond a distance of fifteen or eighteen feet from the corner of the building, is no excuse for his not having placed himself in a position from which he could have seen up to the extreme north end of said track, 'where such looking [in this case] would have been effective.'

"In *Griffin* v. *San Pedro, L. A. & S. L. R. R. Co.*, 170 Cal. 772, [L. R. A. 1916A, 842, 151 Pac. 282], after stating the facts, the court said: 'From these facts it is clear that Mr. Griffin neglected the simplest and plainest precautions for the safety of himself and the others in the automobile. It is the duty of a traveler on a highway approaching a railroad crossing to use ordinary care in selecting a time and place to look and listen for coming trains. He should stop for the purpose of making such observations when necessary. It is his duty to use all his faculties, and it is not enough if he merely listens, believing that the people in charge of any approaching engine will ring a bell or sound a whistle. . . . He [Mr. Griffin] had his car under perfect control. . . . He was running at a very low rate of speed, and it would have been easy for him to stop a short distance beyond the corner at a place of complete safety and one well suited to observation. Failing to do this amounts to contributory negligence on his part.'

"As above suggested, if, in this case, the plaintiff's agent could have gone no farther toward the tracks than the point from which his view up the siding was limited to a distance of fifteen or eighteen feet without danger of getting so close to the track as to have been struck by the part of the engine

extending beyond the rails, he should have stopped his machine, alighted and taken a complete view of the situation. He had no right to assume in the face of the conditions existing in and about the crossing and of which he had knowledge that if there was an engine out of his sight on the siding that the trainmen in charge of the engine would 'ring a bell or sound a whistle.'

"It is, of course, true, as was said by Mr. Justice Burnett, in the very recent case of *Thompson* v. *Southern Pacific Co.*, 31 Cal. App. 572, [161 Pac. 24], 'that the rule requiring the traveler to *stop* is not an absolute one. 'If,' continues the opinion in that case, 'the view is entirely unobstructed, the traveler, while going toward a crossing, may see whether a train is approaching in dangerous proximity. Of course, in a case like that it would be idle to require the traveler to stop to find out something that he can ascertain just as well without stopping. He must, however, avail himself of the vision, and if he is exercising ordinary care, he need not stop except to allow an approaching train to pass so as to avoid collision. *But where the view is obstructed, he must place himself in a position where he can use his faculties of observation to advantage.* In such case he stops—not primarily to avoid collision—but to ascertain whether a collision is threatened. Whereas, if the view is unobstructed, if he stops, it is to allow the approaching train to pass.'

"In this case, as has been shown, the driver of the machine, though confronted by an obstruction to such a view as would enable him to see and ascertain whether there was an approaching engine, did not stop, and thus by his own act of negligence failed to avail himself of a position where he could have used his 'faculties of observation to advantage.' And thus he failed to exercise ordinary care in attempting to cross the defendant's railroad tracks, and in so doing met with the accident and resultant injuries of which the plaintiff complains. Of course, under these circumstances the plaintiff has no legal ground for claiming compensatory damages, and cannot recover.

"There are, as seen, some other points presented by the appellant; but, in view of the conclusion at which we have arrived, viz., that the plaintiff's own testimony shows that the injuries to his machine were entirely due to the culpable

negligence of his agent, the driver of the automobile, said points need not be considered.''

A hearing was granted by this court, principally because of the very urgent insistence of the respondent that the decision of the court of appeal was revolutionary and declared as an inflexible rule of law that the driver of a motor vehicle approaching a steam railroad crossing was negligent if, his vision being obstructed, he did not stop his vehicle, leave it, and go forward for purposes of observation. Such, of course, is not the adopted rule of law in this state, but a fair reading of the opinion of the court of appeal will disclose that it does not lay down this proposition as being the law. Its discussion is addressed to a motion for a nonsuit under the particular facts of the case before it, and it is held that the motion should have been granted because of the manifest contributory negligence of the driver of the motor vehicle in doing what he did. It is unnecessary in detail to recapitulate the facts as above set forth. But in brief the driver was approaching a crossing which he knew and declared to be an especially dangerous one. He was approaching the crossing upon the left-hand side of the roadway, on which side a building obstructed his view of the railroad track on his left hand. He would have had a larger and freer view had he been driving on the right side of the road. When he passed beyond the projection of the building so that he could see down the track, the space, by his own testimony, was so narrow that he had already put himself in a position of danger. Yet he did so drive, on the left side, without even stopping, and he did so place himself that the injury to the automobile was inevitable. It is in dealing with these facts that the language of the court of appeal is to be read, and, so read, that language is sound in law.

The opinion and judgment of the court of appeal is adopted, and for the reasons therein given the judgment is reversed.

ANGELLOTTI, C. J., Concurring.—I concur in the judgment and also in the opinion, except that portion thereof which appears to hold that, upon the facts of this case, the language of the district court of appeal to the effect that if the view of the plaintiff was so obstructed by the mill building that he could not otherwise see the approaching engine

in time, it was his duty, as matter of law, to alight from his machine and go on foot to a point where he would have an unobstructed view, is sound in law. To my mind the best that can be said upon this matter for defendant is that the question whether as a reasonably careful man he should have so done was one for the jury. However, this language is not essential to the conclusion that plaintiff was guilty of contributory negligence as is sufficiently shown by what is said in the opinion.