[Civ. No. 3815. Third Appellate District.—October 15, 1929.]

R. A. HOFFMAN, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

222

Levinsky & Jones for Appellants.

Devlin & Devlin and A. I. Diepenbrock, *Amici Curiae* for Appellants.

Ostrander & Ostrander, F. M. Ostrander, Philip M. Carey and W. F. Ostrander for Respondent.

THOMPSON (R. L.), J.—This is a rehearing from an opinion rendered in an appeal from a judgment for damages for injuries which were sustained in a railroad crossing casualty. The facts are related in greater detail in the opinion which was rendered in an appeal from a former judgment in the same case reported in 84 Cal. App. 337 [258 Pac. 397].

The defendant Southern Pacific Company's Oakdale branch of its railway system extends from Merced to Stockton through an open, flat country. According to schedule the regular passenger train left Merced daily at 7 o'clock A. M., but on the morning of the accident this train was about 25 minutes late in leaving Merced. The plaintiff resided on the Cox Ferry highway, three miles from Merced for more than a year prior to the accident and was therefore familiar with the train schedule. In the locality of plaintiff's home this highway paralleled the railway track

at a distance of 50 feet therefrom. On the morning of the accident a dense fog prevailed, obscuring the landscape so that it was difficult to discern an object more than a hundred feet distant. At 7:30 o'clock the plaintiff in his Buick automobile, accompanied by a companion by the name of Hawkins, who sat upon the front seat by his side, left home and drove along the Cox Ferry road at a speed of 25 or 30 miles an hour, to a cross-road about a mile distant, where he turned abruptly to his left up a slight ascent and across the railroad track. The automobile was an open car. The train was approaching from their rear. Neither of the occupants of the machine heard a crossing whistle or bell or the rumbling of the train. They were not expecting it at that time. Both of them, however, claim to have carefully listened for a train as they approached the track, and assert that they looked down the track in the direction of Merced and saw no train. Except for the dense fog, there was no obstacle to obscure a clear view of the track for the distance of more than a mile. Before reaching the track the speed of the automobile was reduced to six or eight miles an hour. When the front wheels of the machine reached a point five or six feet from the nearest rail, suddenly the headlight of the approaching engine appeared through the fog about 100 feet away. The train was rapidly bearing down upon them. At about the same time both occupants of the machine saw this light and had a glimpse of the engine upon their left. Both exclaimed with surprise. Doubtful of his ability to stop the machine in time to avoid a collision, and fearing that an attempt to increase the speed of the car would kill the engine, in the emergency, the plaintiff promptly shifted the clutch into the intermediate gearing and accelerated his speed. At the same time Hawkins opened the door at his right and jumped from the machine. As the car crossed the track the pilot of the engine struck the rear end of the automobile and hurled it into the ditch. The plaintiff was seriously injured. Chief among his injuries was a triangular fracture of the frontal bone of the skull penetrating to the brain, exposing the cerebrum, and requiring the trephining of the skull. Upon the trial the jury rendered verdict for the plaintiff.

The appellant seriously contends that the record will not support the implied finding of the jury to the effect that the defendant was guilty of negligence in failing to ring a bell or blow a whistle as required by section 486 of the Civil Code. It is also contended that the court erred in permitting the amendment of the complaint; in issuing a special venire for trial jurors; in admission of evidence and in giving, refusing to give and modifying instructions. The chief contention and the serious question is whether the plaintiff was guilty of contributory negligence in failing to stop his machine before attempting to cross the railroad track in a dense fog.

The law does not require the driver of a vehicle to actually stop under any and all circumstances before crossing a railway track. There is no absolute duty on the part of one to first stop before he attempts to cross the track. In 33 Cyc. 1010 it is said: "By the weight of authority it is not necessarily negligence on the part of one about to cross a railroad track to fail to stop in addition to looking and listening for trains, unless under the existing circumstances he cannot listen without stopping; but whether such a traveler must stop in addition to looking and listening depends upon the facts and circumstances of each particular case and so is usually a question for the jury. So it is held that a person need not stop before going on the track if he can look and listen effectively without doing so."

The test as to the existence of contributory negligence on the part of one who attempts to cross a railroad track ahead of an approaching train is the question as to whether under such circumstances a reasonably prudent person would have undertaken to do so. When the circumstances of a particular case are of such a nature that different conclusions may reasonably be drawn as to the prudence of a person in attempting to cross a railroad track the question of contributory negligence becomes one for the determination of the jury. (*Murray* v. *Southern Pac. Co.,* 177 Cal. 1 [169 Pac. 675]; *Whitney* v. *Northwestern Pac. Ry. Co.,* 39 Cal. App. 139 [178 Pac. 326]; *Firth* v. *Southern Pac. Co.,* 44 Cal. App. 511 [186 Pac. 815]; 41 A. L. R. 420, 424, note; 22 R. C. L. 1034, sec. 267; 3 Elliott on Railroads, 358, sec. 1167.) Where there is nothing to obstruct one's view of a railroad track for a distance from a pro-

posed crossing amply sufficient to preclude the possibility of a train arriving before one could cross the track with reasonable safety, there is no reason for the driver of a vehicle to stop the machine before crossing the track. (22 R. C. L. 1034, *supra*.) ■ But when one's view is obstructed by buildings or other obstacles, or one's hearing is impaired by the noise of the operating of the machine which is being driven, it may be negligence for the driver not to stop so as to enable him to secure reasonably safe vision and hearing of an approaching train. (*Barnett* v. *Atchison, T. & S. F. Ry.*, 99 Cal. App. 310, 278 Pac. 443; 22 R. C. L., p. 1030, sec. 262; 3 Elliott on Railroads, 358, sec. 1167; 33 Cyc. 1019; *Koster* v. *Southern Pac. Co.*, 207 Cal. 753 [279 Pac. 788].) ■ When a dense fog obscures one's view, greater caution should be observed in crossing a railway track than might suffice at a time when the atmosphere is clear. (*Hoffman* v. *Southern Pac. Co.*, 84 Cal. App. 337 [258 Pac. 397]; 19 A. L. R. 872, note.)

■ Under the circumstances of the present case, however, we are inclined to think it may not be said as a matter of law that the plaintiff was guilty of contributory negligence in failing to stop his machine or his engine before attempting to cross the track. In other words, this case appears to present a situation which properly requires the question of contributory negligence to be presented to the jury for its determination. It is self-evident that the plaintiff's vision down the track would be neither improved nor impaired by the mere stopping of his machine. His vision could penetrate the fog no farther from a stationary machine than from one which was in motion.

The case of *Koster* v. *Southern Pac. Co.*, *supra*, determined that the driver of an automobile who lost his life in a railroad crossing collision was guilty of contributory negligence as a matter of law. The facts of that case may, however, be distinguished from those of the present case. The accident occurred in the city of San Jose. The deceased had made daily trips in his automobile over this crossing and was familiar with its dangers as well as the train schedule. The four corners of the street which was intersected by the track at this point were occupied by factory buildings, two of which were in active operation at that time and were creating considerable noise by the run-

ning of the machinery and the exhausting of steam. There was evidence that the noise from these factories was so great as to prevent one who was riding in a closed car at this crossing from hearing the sound of the whistle or the bell. The approach to the crossing from the direction in which the deceased was driving was hidden by a building and a high board fence for the distance of a full block. There were three parallel tracks at this crossing, on one of which a box-car was stationed. From a point 243 feet north of the crossing, a view of the track in the direction from which the train was approaching was obstructed until a machine reached a point some 12 to 20 feet from the track. In violation of an ordinance limiting the speed of a motor vehicle to 15 miles an hour at crossings within the city, the deceased was said to have driven his car on to the track ahead of the approaching train at from 30 to 40 miles an hour, without attempting to stop. With knowledge of the presence of these obstructions to both the sight and the sound of an approaching train and that a train was then about due to arrive, it was clearly contributory negligence on the part of the deceased to have attempted to cross the track without stopping. No such condition of obstruction to sound, at least, existed in the present case.

In this case, while it might be a question ordinarily open to doubt, there is substantial evidence upon which the jury was warranted in concluding the plaintiff's engine made less noise while the automobile was running than it would have made while merely idling with the machine stationary. We are of the opinion that the evidence may be said to reasonably support the implied conclusion of the jury that the engine of the automobile while it was in motion was so noiseless as to impair the hearing of its occupants only slightly, and to, therefore, make it unreasonable to hold that as a matter of law it was negligence not to have actually shut off the gas and stopped the engine entirely before attempting to cross the track. The appellant argues that if the machine had been stopped just before reaching the crossing, the accident would not have occurred. But this is not conclusive of negligence. It is equally true that if the train had been on time the morning of the accident, or ten seconds later than it was, the accident would not have occurred. The real question to determine

is whether the plaintiff could have seen or heard the approaching train to better advantage if he had stopped his machine; and whether a reasonably prudent person would under such circumstances have stopped his engine or his machine before attempting to cross the track. ■ We are inclined to think that reasonable minds might differ as to whether one should or should not have stopped the machine under such circumstances and that the question of contributory negligence was, therefore, a question for the jury.

■ The chief element of negligence on the part of the defendant railroad company which is relied upon is the charge that the whistle was not blown and the bell was not rung before reaching the crossing. There was a serious conflict on this subject. The plaintiff testified that up to the time of the crash "there was no whistle blown or bell rang." He claimed to have been carefully watching and listening for the train; that before reaching the crossing he looked "back down the track towards Merced to see if the train was coming. Q. Did you see any? A. No sir. . . . Q. State what observation you made in going up the grade? . . . A. I was looking for the train all the time. Q. When for the first time did you see any train, if you did see any? A. Not until I got on the track, or almost on it. Q. Then to your best knowledge, where was the train? A. About 80 or 100 feet down the track. . . . I saw the headlight, is the first thing I saw. . . . I shifted the gears to second as soon as I saw the headlight. . . . I stepped on the gas with my foot, just as quick as I shifted. . . . I turned the wheel as far as I could . . . to the right." The plaintiff testified that if he had suddenly stepped on the accelerator while the machine was slowly going upgrade it would have killed the engine. Mr. Hawkins, the companion of plaintiff, testified that both he and the plaintiff looked and listened for the train, and although the machine made no unusual noise, he heard no whistle or bell until immediately preceding the crash. Mr. Walker lived 200 yards from the crossing, and at the time of the accident was preparing to drive his own car out of his yard on his way to work. He was listening for the train and said he heard "a very indistinct whistle which I presume was about the cement plant," one mile distant. He had driven out toward

the crossing, but did not see the train until it was about 80 feet away. In response to the question "Why didn't you see it before?" he replied, "Because it was too foggy." He also testified that except for the faint sound of the whistle at the cement plant one mile away, he heard no other whistle or bell until just at the time of the crash. Both Ernest and John Campodonica, father and son, who lived only 25 or 30 yards from the scene of the accident, the father being engaged in the yard, and the son looking out of the window toward the crossing, heard neither whistle nor bell until immediately prior to the accident. Arthur, the son of plaintiff, and his wife, Josie, who were at their home, half a mile from the crossing and within 100 feet of the track where the train passed, testified that while they usually heard the morning train, they heard no whistle or bell on this occasion. Mr. Dysart, who also lived in the same vicinity, was working about his stable 200 feet from the track at the time the train passed, and testified to substantially the same thing. Since the fog was so dense on the morning of the accident the jury may have assumed the engineer did not see the whistling-post, and, therefore, may have omitted to give the usual crossing warnings. The foregoing testimony furnishes sufficient evidence to support the implied finding of a failure to blow the whistle or ring the bell.

■ During the process of the trial, on motion, the plaintiff was permitted to amend his complaint to include a demand for damages in the sum of $1500 for medical aid in the performance of a necessary surgical operation resulting from the injuries sustained. The original complaint alleged that the plaintiff was "severely and permanently injured." There was no abuse of discretion in permitting this amendment. The language of the original complaint was adequate upon which to admit evidence of permanent injuries. (7 Thompson's Commentaries on Negligence, p. 1009, sec. 7602.)

■ The amendment was sufficient upon which to admit testimony to include the necessary cost of future medical services. (8 Thompson's Commentaries on Negligence, p. 956, sec. 7327.) In 3 Sutherland on Damages, p. 2781, section 944, it is said: "In estimating the pecuniary loss in such cases all the consequences of the injury, future as well as past, are to be taken into consideration. . . . These are pre-

sumed to embrace indemnity for actual nursing and medical expenses." Section 3283 of the Civil Code authorizes the recovery of damages which are reasonably "certain to occur in the future." (8 Cal. Jur., p. 754, sec. 22.) ██ Doctor Parker testified that the fracture of the plaintiff's skull required the operation of trephining. He said this operation left a "depressed area in his skull and . . . a hard scar tissue formation there, which is deep in, and it has been producing a pressure on his cerebrum," together with frequent severe shooting pains in the head, and that epilepsy would probably result unless another operation were performed to relieve the pressure on the brain; that this operation would reasonably cost about $1500. The evidence amply supports the judgment with respect to the injuries and the necessary future expense which would be reasonably certain to accrue as a result of the accident.

██ Over the objection of defendants, Doctor Parker, who treated the plaintiff for his injuries, and who subsequently examined him a short time before the last trial to ascertain his physical condition, was permitted to testify in response to a hypothetical question that the plaintiff's present condition as above stated was the result of the injuries sustained in the railroad crossing accident. The hypothetical question did not fully state the facts involved upon which his opinion was necessarily based. But the ruling was not erroneous, since all of the remaining necessary facts had been previously testified to by this witness and it is apparent that his opinion was based not only upon the hypothetical question which was propounded, but also upon his personal examination, treatment and knowledge of the patient's condition.

██ October 24, 1927, this case was set for trial, at which time the plaintiff demanded a jury, according to the amended court minutes as shown under the date of the court proceedings of March 12, 1928. There is some controversy regarding the demand for a jury on this date. The court minutes, however, must control in this regard. ██ But the case was formerly tried before a jury and reversed on appeal. It seems to be conceded a proper demand for a jury was made for the first trial. It was not necessary to repeat the demand for a jury at the time the case was finally set for trial. The original demand

was continuing in its effect. Section 631 of the Code of Civil Procedure provides that the constitutional right to a trial by jury is waived under such circumstances as are here involved "by failing to announce that a jury is required, *at the time the cause is first set upon the trial calendar. . . .*" In the case of *Wendling Lbr. Co.* v. *Glenwood Lumber Co.*, 19 Cal. App. 1, 6 [124 Pac. 734, 735], it is said: "It was not necessary to formally renew them (the demand for a jury and payment of fees), since it appears that plaintiff was still relying upon them. The demand must be considered as a continuous refusal to waive the right to a jury. It was not necessary to repeat the demand."

However, the demand for a jury appears to have been formally repeated on October 24, 1927, when the case was reset for trial. Instead of ordering a jury from the regular panel pursuant to section 214 of the Code of Civil Procedure, the court ordered a special venire under section 226 of the same code. At the time of trial the defendants informally objected to the special venire and requested the court to draw a jury from the general panel, which was denied. The record contains no showing as to the existence or absence of names in the trial jury-box, except that in the colloquy between counsel and the court, it was stated that it was the custom of the court to issue a special venire. The panel was not formally challenged. No evidence was adduced in support of defendants' objections to the special venire. There is no attempt to show that the defendants were prejudiced by the trial by jurors drawn by means of a special venire. ■ It is the custom and preferable practice to order a trial jury to be drawn from the regular panel. (*Amos* v. *Superior Court,* 196 Cal. 677, 682 [239 Pac. 317].) ■ In the absence of a formal showing that a special venire was not necessarily drawn pursuant to the specific authorization of section 226 of the Code of Civil Procedure, it must be assumed there was no abuse of discretion on the part of the court and that the denial of defendants' motion was not prejudicial or erroneous. (*Estate of Wall,* 187 Cal. 50, 54 [200 Pac. 929].)

■ After the jury had been impaneled and during the process of the trial the defendants moved the court to discharge one juror by the name of Mary Hayes on the sole ground that she was the aunt of a clerk who was employed

in the office of one of the attorneys for plaintiff. This juror was qualified on the *voir dire.* There is no abuse of discretion on the part of the court in refusing to discharge a juror in the midst of a trial where no prejudice is shown on the part of the juror. It cannot be presumed as a matter of law that a juror is biased and prejudiced in favor of a plaintiff merely because her niece is employed in the office of the litigant's counsel.

 The appellants have cited 53 assignments of alleged misconduct of counsel for plaintiff in the process of trial. Most of them consist of interruptions of counsel on cross-examination with the evident purpose of correcting what was assumed to have been misstatements or misinterpretations of the evidence of a witness; some of them do contain suggestions as to the answers of witnesses under examination. It must be conceded some of these assignments of misconduct do illustrate the prevailing practice of interrupting the orderly trial of a case, frequently resulting in distracting contests of wits or zeal between counsel and an ignoring of the authority of the trial judge, to whom all such conflicts should be addressed. Probably the most flagrant transgression occurred in the examination of prospective jurors on the *voir dire.* Several jurors were asked if they would become prejudiced if it should appear that a verdict was secured by the plaintiff on a previous trial, and that the judgment was reversed on appeal. The purpose of these questions is apparent. It is a common fault to permit counsel in the examination of jurors to resort to argument, prejudicial inferences and theoretical application of the law. However, the jury were subsequently furnished complete knowledge of the previous trial by the abundant use of the transcript of the former trial, on the part of respective counsel, for impeachment purposes. Moreover, upon objection, the court instructed the jury as follows: ''The jury are here for the purpose of trying this case right now, the same as if it never had been tried at all, that is their province and their duty to regard it in that way, and you are to act upon the evidence as it comes in here.''

Also, in the court's charge to the jury, they were instructed to the effect that the judgment must be rendered solely upon the evidence adduced at the trial. Finally, the defendants failed to request the court to instruct the

jury to disregard these expositions of counsel, and may ordinarily, therefore, not complain. (*Scott* v. *Times-Mirror Co.,* 181 Cal. 345, 368 [12 A. L. R. 1007, 184 Pac. 672] ; *People* v. *Simon,* 80 Cal. App. 675, 678 [252 Pac. 758].)

The appellant has assigned some sixty-five specifications of alleged errors in the course of the trial, most of which are addressed to the admission of evidence. After an examination of the record as to each assignment, while it appears that liberal latitude was allowed the plaintiff in examination of witnesses and some technical errors in ruling exist, we are of the opinion there is nothing so prejudicial as to require a reversal of the judgment on this ground. Regarding the second assignment, it may have been a conclusion for Hawkins to say that if the headlight of the engine had cast rays of light along the track in front of the automobile, he could have seen them. There was no harm in permitting the answer. At most, it was only a question of how far the rays from the headlight of an engine would act as a warning in a dense fog. This would depend on the intensity of the light and the density of the fog. The common judgment of jurors must make allowance for such uncertainties in view of the physical conditions which appear to exist under the circumstances. There was no error in permitting the plaintiff to show the nature of the soil at the crossing. Since gravel and dirt were found in his wounds, it tended to show the seriousness of his injuries. The nature of plaintiff's employment as a well digger, and the cost of hiring a man to take his place while he was incapacitated from his injuries, tended to establish the measure of his damages. The evidence of plaintiff's subsequent injury from a blow on the head was not competent, unless it may have tended to show he was more susceptible to injury on account of the sensitive condition of his head owing to the fracture of his skull. It was, however, not prejudicial. Before permitting a witness to describe the position and condition of the automobile as it lay in the ditch at the crossing 24 hours after the accident, it should have been shown that no substantial change occurred in the meantime. But the machine was completely demolished by the collision. There was no contention to the contrary. It was stipulated that the reasonable value of the machine was $200. There was, there-

fore, no prejudicial error in this ruling. ▮▮▮ The fact that the machine was found after the accident to be in the second gearing merely tended to corroborate the plaintiff's statement that he shifted to that gearing immediately before the collision. This ruling was harmless. No substantial error exists in these rulings of the court.

The defendants have challenged the giving, refusing and modifying of numerous instructions. To review each of these instructions would extend this opinion to unwarranted length. The objections to several of these instructions are covered by the principles of law heretofore announced.

We find no prejudicial error in the charge to the jury, with the exception of one instruction which was given at the request of the plaintiff, as follows:

"It is not necessary that plaintiff prove all the allegations of negligence set forth in his complaint in order to recover. The proof of any one is sufficient. Therefore, even if you may find that the whistle was blown or the bell rung, as required by law, still, if you find that the train was being operated at a dangerous and excessive rate of speed, and that by reason thereof the accident occurred, and that the injuries of the plaintiff were the proximate result thereof, such proof is sufficient to entitle plaintiff to recover damages in this action, providing that the plaintiff himself did not proximately cause or contribute to said injuries by any negligent act of his own."

▮▮▮ We are convinced that the giving of this instruction constituted prejudicial error which requires the reversal of the judgment. The chief assignment of negligence and the only one that finds support in the record sufficient upon which to uphold the judgment even upon the principle governing the existence of a conflict of evidence, is the claim that the whistle was not blown and the bell was not rung as required by law when the train was approaching the crossing. By means of the foregoing instruction the jury was charged that a judgment for plaintiff might be based alone upon a finding that the train was running at an excessive rate of speed at the time of the accident, even though the jury determined that the whistle was blown or the bell rung as required by law. There are no facts or circumstances in the present case which will warrant this finding of negligence, unless it may be said that the

operator of a passenger train running over a country cross-
ing on a straight track across a level country at a speed
not to exceed 40 miles an hour with no artificial or natural
physical obstructions to sight or sound, is guilty of neg-
ligence for failure to slacken its speed on account of the
presence of a dense fog which obscures the view and con-
fines the vision of the engineer to the radius of his headlight
a distance of only 80 to 120 feet ahead of the tender. ▇
The fact that the train was 25 minutes late in leaving
Merced and that it rolled 500 feet after the emergency
brakes had been applied before it was brought to a stop
only tend to show a rapid rate of speed rather than an
excessive velocity. Considering the facts in this case in
the light of the above challenged instruction and assuming
that the whistle was blown as required by law, at inter-
vals for a distance of 80 rods before reaching the crossing,
or that the bell was rung constantly while the train was
covering that interval of space, there is no rational way of
accounting for a failure to hear the approaching train, un-
less the occupants of the automobile were deaf or carelessly
inattentive or the noise of their machine impaired their
hearing. ▇ The first is not claimed to have been true,
the second is no legal excuse and the third would require the
stopping of their machine and engine to purge them of the
charge of contributory negligence. ▇ The statute does
not require both the blowing of the whistle and the ring-
ing of the bell. Either is deemed to be a sufficient warning
under ordinary circumstances. It is true that a dense fog
would obstruct the view, but not the hearing. Where phy-
sical objects like buildings, embankments or dense growth
of trees, or when the din and commotion of a storm prevent
one from hearing to good advantage the approach of a train,
these may be taken into account, together with the rapid
speed of the train, in determining whether it was negligently
traveling at an excessive rate of speed under the circum-
stances. So also excessive speed of a train traveling
through a crowd of people or in a thickly populated por-
tion of a city may constitute negligence. Under such
circmstances it becomes a question for the jury to deter-
mine whether the operation of the train under such condi-
tions and circumstances amounts to negligence. (*Bilton* v.
*Southern Pac. Co.*, 148 Cal. 443, 447 [83 Pac. 440]; *Tousley*

236

v. *Pacific Elec. Ry. Co.*, 166 Cal. 457 [137 Pac. 31]; *Bado-stain* v. *Pacific Elec. Ry. Co.*, 83 Cal. App. 290, 295 [256 Pac. 576]; 3 Elliott on Railroads, p. 337, sec. 1160; 22 R. C. L., p. 1011, sec. 242; 33 Cyc. 791.) No such conditions, however, existed in the present case. In the absence of an ordinance or statute to the contrary and in the absence of such conditions or circumstances, the mere rapid speed of a train traveling through an open country unobstructed by physical objects, regardless of the presence of fog, will not amount to negligence. There is no legal obligation on the part of a railroad company to slacken the speed of its trains at country crossings. (*Larrabee* v. *Western Pac. Ry. Co.*, 173 Cal. 743 [161 Pac. 750]; 3 Elliott on Railroads, 2d ed., p. 337, sec. 1160; 22 R. C. L., p. 1011, sec. 242; 33 Cyc. 791.) Dense fogs frequently prevail on the coast and in the tule lands of California. To require a railroad train to retard its speed and abandon its time schedule traveling through an open country merely because of the presence of fog would be destructive of the efficiency of this necessary means of transportation.

In the case of *Henry* v. *Boston & Maine R. R. Co.*, 125 Me. 366 [134 Atl. 193], it was held that a passenger train which was running at a speed of 40 miles an hour on a foggy day, and sounding the statutory signals at a crossing in a country district, was not guilty of negligence for failure to slacken its speed. In that opinion it was said: "The railroad is chartered to carry passengers at a high rate of speed. Unless it did so carry them, it probably would not carry them at all." It is further said the presence of fog "should admonish the traveler upon the highway to exercise greater vigilance and caution in approaching a railway crossing."

 It is true that the presence of fog or unusual climatic conditions which obscure the view or impede the hearing makes it more important to blow the whistle or ring the bell of an engine as a warning upon approaching a country crossing. Such warning signals are ordinarily deemed to be adequate notice, and a train is not required to stop or slacken its speed at country crossings merely because of the presence of fog.

In the case of *Pennsylvania Ry. Co.* v. *Stegaman*, 22 Fed. (2d) 69, it was also said that when statutory signals were

given at country crossings the operator of a railway train is not guilty of negligence for running at its usual rate of speed notwithstanding the presence of fog. It was said: "As there are road crossings in the country every few miles, it is inconsistent with proper speed of transportation that trains should slack up for such crossings. Safety is secured to persons at such crossings by the observance of the statutory signals. . . . The impairing of visibility by fog or snow is a common condition. If it were in the discretion of a jury to say that it is negligence to maintain regular ordinary speed within any reasonable limit, through open country in a fog, it would be necessary under such conditions to abandon all time schedules."

There are a few cases reported in the southern states wherein it has been held that the speed of a railway train must be so regulated when traveling in a fog as to enable it to be stopped within the radius of its headlight. These cases are usually accompanied by facts indicating that the location of the crossings where the accidents occurred were particularly dangerous on account of heavy traffic, dense population or the presence of physical obstructions to sight or sound. Except for such modifying dangerous conditions, we would not be able to subscribe to such a doctrine. It would seem absurd and destructive of the usefulness of railroads as common carriers to hold that trains must poke along in an open unobstructed country through a fog or snowstorm at a rate of speed which would permit the stopping of a heavy passenger train within the distance that the rays of its headlight were projected. This would often be a physical impossibility, as is demonstrated by the evidence in the present case. The plaintiff said he first saw the headlight when the train was but 80 to 100 feet away. The engineer admitted that his headlight disclosed a view of the track only 120 feet ahead of the tender. The emergency brakes were immediately applied and the train rolled 500 feet before it was brought to a stop.

While it is true that facts and conditions may exist which will warrant the submission to the jury of the question of negligence which is associated with excessive speed regardless of the sounding of the whistle or bell, no such circumstances appear in the present case. Since the jury were told that their verdict might be based upon a theory

of excessive speed alone, we are unable to say their verdict was not the result of this erroneous instruction, and it, therefore, becomes necessary to reverse the judgment.

Accordingly, the judgment is reversed.

Finch, P. J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 14, 1929, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 9, 1929.

Langdon, J., dissented.