[Civ. No. 5490. Third Appellate District.—July 7, 1936.]

CHARLES RICHARD DOWNING, an Infant, etc., Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

George R. Freeman and W. D. Tillotson for Appellant.

Carter & Barrett and Swaffield & Swaffield for Respondent.

PULLEN, P. J.—This is an appeal from a judgment and order awarding plaintiff damages suffered by him as the result of the death of his father, who was killed in a collision between an automobile driven by the father and a passenger train operated by the defendant Southern Pacific Company, at the Olney Creek crossing about four miles south of Redding.

The collision occurred at about 8:30 o'clock on the evening of June 11, 1931, and resulted in the death of the driver William Downing, the father of plaintiff, the mother of plaintiff, an elder brother, and serious injuries to a guest, Miss Fitzpatrick.

The collision occurred at a point where the river road, upon which decedent was driving, crossed at right angles over the single main track of the Southern Pacific Company. The railroad runs in a general northerly and southerly direction, paralleled on the west by the main state highway and on the east by what was referred to as the county road. The railroad tracks are about one and one-half feet above the surface of the roadways. The night of the collision was dark and cold, and plaintiff's father, mother, brother and Miss Fitzpatrick had driven from Redding to the home of a Mr. Hinman. About 8:30 o'clock they left the Hinman home to return to Redding. They approached the Olney Creek crossing from the east, traveling westerly along the river road. The passenger train of defendant, known as train number 13, was proceeding south at a speed of fifty or fifty-five miles an hour. The train and automobile met at the intersection of the river road and the railroad track, with the tragic result stated above.

Upon the trial of an action brought by plaintiff herein for the death of his father, the jury awarded him substantial

damages. It is the contention of appellant, Southern Pacific Company, that there was not sufficient proof of the negligence of defendant, and that plaintiff's father was guilty of contributory negligence. It is also contended upon this appeal that certain erroneous instructions were given the jury.

When a verdict is attacked as being unsupported, the power of a court of review is rigidly circumscribed. The rule is fairly stated in *Crawford* v. *Southern Pacific Co.*, 3 Cal. (2d) 427 [45 Pac. (2d) 183], as follows:

"In reviewing the evidence on such an appeal, all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (Citing cases.) To establish the defense of contributory negligence as against the verdict of a jury, the evidence must be such that the appellate court can say that there is no substantial conflict on the facts, and that from the facts reasonable men can draw but one inference, which inference points unerringly to the negligence of the plaintiff proximately contributing to his own injury. (Citing cases.)"

With that principle in mind let us consider the evidence. Turning our attention to the physical conditions at the point of collision the jury were told that a vineyard and orchard of walnut and apricot trees were growing along the north of the river road and east of the railroad right of way. Also to the east of the railroad and west of the county road there was grass and clumps of willows, and within the right of way of the railroad to the east of the tracks were also some small clumps of willow and grass. A rather larger clump of willows was also growing just outside of the right of way fence on the east, and close to and west of the county road, and about ninety feet north of the junction of the river road and county road. There was also a right of way fence along the easterly boundary of the railroad right of way and

a double line of telegraph poles. The customary railroad warning sign bearing the letters "Railroad Crossing" was situated at the junction of the river road and the railroad, but west of the tracks and on the south side of the river road. There was no warning sign on the east of the railroad, being the direction from which decedent was approaching.

Mr. Fagundes, who lived about one hundred yards east of the crossing and on the south side of the river road, testified that from his house the view of the railroad toward the north was obstructed to some extent. He was asked if he could see the trains before they reached the crossing, and he replied: "Not very far. You can see them when they get to the crossing. Q. Can you look across the vineyard and see trains coming? A. Yes, a little ways." From the testimony, together with certain photographs received in evidence, the jury were justified in finding the view of an occupant of an automobile on the river road was obstructed.

It does not appear that the deceased was familiar with the Olney Creek crossing. The only evidence on that point is that the deceased had lived in Redding for several years, and had on previous occasions visited at the Hinman home, and on the evening of the accident he had driven across the same crossing about an hour previously on his way to Mr. Hinman's. It is in evidence, however, that the Hinman home can be reached by crossing the railroad tracks about a mile and a half north of the Olney Creek crossing. The record does not disclose which of these routes deceased had used on his previous visits to the Hinman home. It is also a physical fact that the main state highway lay to the east of the railroad tracks, upon which highway on the night in question and at the time of the collision, automobiles were traversing with headlights burning. The jury could conclude that decedent mistook the headlight of the train, if he saw it, for an automobile traveling south, or the jury might have concluded the decedent thought the track was west of the highway, and in the darkness misjudged the distance to and the location of the railroad crossing. Under the evidence the jury could have so believed, in view of the presumption that a person takes ordinary care of his own concerns, and also by the location of the railroad warning post. Some evidence was offered by appellant that decedent was at times preoccupied or absent-minded, but we can hardly as-

sume that all of his guests were likewise preoccupied, and in view of the responsibility placed by law upon a guest riding in an automobile, we must assume that if they saw or heard the train they would have given some warning to the driver. Inasmuch also as all of the persons who were in the car were killed excepting Miss Fitzpatrick, who by reason of her injuries was unable to recall anything that occurred after leaving the Hinman home, there is no evidence that the driver of the car did not exercise due care. He may have done all things required of a prudent driver approaching a railroad crossing. It is true, the fireman testified he saw the car at the intersection of the county road approach the railroad crossing at a speed of thirty or forty miles an hour, but he being an employee of the Southern Pacific Company, and also one of the defendants, was not entirely a disinterested witness and the jury could have disregarded his testimony under their duty to determine the credibility of a witness and to give it such weight as they might deem proper. (*Lejeune* v. *General Petroleum Corp.*, 128 Cal. App. 404 [18 Pac. (2d) 429].) The theory that the driver may have mistaken the beam from the headlight of the engine for an automobile headlight, and did not know or recall the relative position of the railroad and the highway, is supported somewhat by the statement of Donald Downing, one of the guests in the automobile, who, when questioned at the scene of the accident just before his death, asked who the driver of the other car was that struck them.

It is the claim of defendant that the engine bell was ringing and that the whistle was sounded for the Olney Creek crossing. That is testified to directly by the engineer and fireman of train number 13; also by William L. Roberts, an engineer employed by the Southern Pacific Company, who was riding as a passenger in the first coach of the train, and by Harry B. Scott, who was also an engineer for the Southern Pacific Company, who was riding as a passenger that night on train number 13. Elwood J. Doll, an express messenger riding in the fourth car from the engine, testified on direct examination that the whistle was blown for the Olney Creek crossing, but on cross-examination stated that just a few seconds, perhaps ten seconds as an approximation, after hearing the whistle he felt the application of the air and something hit the car in which he was working. Dewey

Casebeer, who was driving south in his automobile along the state highway, ahead of train number 13, heard a whistle for Olney Creek crossing when the engine was about three hundred or four hundred feet north of the crossing.

Section 486 of the Civil Code requires that a bell be rung or a steam whistle be sounded at least eighty rods, that is, 1333 feet, from the place where the railroad crosses any highway.

If Mr. Doll is approximately correct in his estimate of time and Mr. Casebeer in his estimate of distance, it is apparent that the whistle was not first sounded eighty rods from the crossing.

Mrs. Emma Reno heard two long whistles and a short whistle and then the crash of the collision. Lester Horton, who lived at the Reno home, also testified he heard a whistle and the crash, and ''they were right close together''. As opposed to this testimony other witnesses testified the bell was not rung or the whistle blown, or that they did not hear a bell or whistle. Some witnesses, such as Mr. Fagundes, said he could not remember hearing a bell or whistle, but he was in the house reading the paper. Mr. and Mrs. Cherry were in their home not far from the crossing and heard no whistle or bell, but they were entertaining some friends that night. ■ The rule is that negative testimony that the witnesses heard no whistle or bell is sufficient to sustain the finding that no warning was given notwithstanding the positive testimony of other witnesses to the contrary, provided the witness was in a position to hear and observe whether a warning bell or whistle was sounded. (*Thuet* v. *Southern Pac. Co.*, 135 Cal. App. 527 [27 Pac. (2d) 910] ; *Scherer* v. *Southern Pac. Co.*, 140 Cal. App. 528 [35 Pac. (2d) 356] ; *Thompson* v. *Los Angeles etc. Co.*, 165 Cal. 748 [134 Pac. 709].)

Sanford and Randall, the head and rear brakemen of train number 13, were on duty at the time of the accident, one riding in the forward coach and the other in the rear coach, and they were undoubtedly listening for whistles of all kinds from the engine of their train. Both testified they had no recollection of hearing a whistle for Olney Creek crossing. John F. McReynolds, who was in the service station about 150 feet from the crossing, heard the train approach but did

not hear any bell or whistle before the crash, but heard the noise of the approaching train.

The most positive testimony that no bell or whistle warning was given is that of Donald W. McReynolds, who was driving a Ford coupe south along the highway paralleling the track, at about fifty miles per hour. He was about 400 yards ahead of the train when he heard it whistle for the hospital crossing, which is one and one-half miles north of the Olney Creek crossing. He then watched the train in his rear view mirror as it gradually gained on him. As he stopped at the service station at Olney Creek crossing, the train reached the crossing and he heard a crash and then heard the train whistle. On direct examination he testified that neither the bell nor whistle was sounded before the collision. On cross-examination counsel for defendant asked him, ''Q. But you do not mean to tell the jury that the bell did not ring or the whistle did not blow? A. I did not hear it. Q. That is all you will say? A. I hear pretty good.'' We believe the testimony of this witness alone was sufficient to support the finding of the jury that no warning signal was given, but aided as it was by the negative testimony of the two brakemen of train number 13, as well as other witnesses, it is given further support. We believe, therefore, an issue of fact was created for the jury, who resolved that issue adversely to the defendant.

■ Passing to the alleged error in the giving of certain instructions, we consider first, plaintiff's instruction number 16, which in part declares, '' . . . You are further instructed that even if you believe that warning signals were given, but also find from the evidence that the speed of the train was such as to render the signal or signals useless, and that such speed was negligent under such circumstances and was the proximate cause of the death of William R. Downing, father of the plaintiff, then your verdict must be for the plaintiff, unless you also find that William R. Downing was himself guilty of contributory negligence which proximately contributed to his death.''

Appellant argues that the foregoing instruction was erroneous in that speed alone, although excessive in approaching an open or unobstructed country crossing, does not constitute negligence, and cites in support thereof the cases of *Hoffman* v. *Southern Pacific Co.,* 101 Cal. App. 218 [281

Pac. 681]; *Larrabee* v. *Western Pacific Ry. Co.*, 173 Cal. 743 [161 Pac. 750]; *Friddle* v. *Southern Pacific Co.*, 126 Cal. App. 388 [14 Pac. (2d) 568].

The questioned instruction, however, did not deal with excessive speed as such, but merely instructed them that if the speed was so excessive as to render a bell or whistle ineffective as a warning to one approaching a crossing, and if the jury further found such excessive speed was negligence then plaintiff might recover. In other words, the jury were told that if they found such excessive speed was negligence, and it was the proximate cause of the injury, then plaintiff might recover.

In *California Rendering Co.* v. *Pacific Electric Ry. Co.*, 205 Cal. 73 [269 Pac. 922], it is said: ''These cases (*Bilton* v. *Southern Pac. Co.*, 148 Cal. 443 [83 Pac. 440], and *Larrabee* v. *Western Pac. Ry. Co.*, 173 Cal. 743 [161 Pac. 750]) do not change the general rule that the question of negligence is for the trial court to determine in view of all the circumstances surrounding the collision, while it is well established that proof of a given high rate of speed, in the absence of a statute or ordinance, does not establish negligence *per se*, it is equally well established that a car traveling at the same high rate of speed is not necessarily operated in a manner free from negligence. (*Tousley* v. *Pacific Electric Co.*, 166 Cal. 457 [137 Pac. 31].) A rate of speed which in some circumstances would be regarded as reckless might in other circumstances be held to be proper.''

Defendant also contends the court erred in the giving of some eight instructions advising the jury that the plaintiff's father was presumed to have exercised due care, and in refusing to give two instructions offered by defendant to the effect defendant was likewise presumed to have exercised due care. The presumption of due care on decedent's part and embodied in the instructions complained of is embodied in section 1963, paragraph 4, of the Code of Civil Procedure. This presumption is one which may be invoked for the benefit of plaintiff when unable to produce any eye-witnesses to a collision and is based upon the sound foundation of the natural law of self-preservation. Where it is possible to call eye-witnesses to testify positively to the facts and circumstances surrounding the accident, the presumption is not applicable. As it is said by Mr. Justice

Henshaw in the case of *Crabbe* v. *Mammoth Channel Gold Min. Co.,* 168 Cal. 500 [143 Pac. 714, 716]: "Where death is occasioned under circumstances such as this, without eye-witnesses, the law comes to the aid of the plaintiff who is pressing a suit for damages for the death, and that law is found in the presumption of the Code of Civil Procedure, namely, that a person takes ordinary care of his own concerns. This is a controvertible presumption, it is true, but until controverted, it is evidence in accordance with which the jury is bound to decide."

In *Larrabee* v. *Western Pac. Ry. Co., supra,* the court said: "But touching the presumption that the deceased exercised ordinary care, it is to be noted that that presumption is given weight only in the absence of evidence on the subject of the deceased's conduct."

It is therefore clear that plaintiff was entitled to the presumption in the case at bar, but defendant under the circumstances, was not. (*Noble* v. *Key System, Ltd.,* 10 Cal. App. (2d) 132 [51 Pac. (2d) 887]; *Gorman* v. *County of Sacramento,* 92 Cal. App. 656 [268 Pac. 1083].)

██ Complaint is also made of the closing argument of counsel for respondent to the jury.

We have examined the citations of alleged misconduct, and do not find they justify a reversal. In fact, in practically every instance where the matter was called to the attention of the court the jury were admonished to disregard the statements, and such admonition was sufficient to cure an error, if such in fact existed. The jury were also told in the final instructions of the court as to what their verdict should be based upon, and cautioned them to distinguish between the facts as testified to by witnesses and statements made by counsel in their arguments or during the trial. We do not find that appellant was injured by the statements of counsel during his closing argument.

██ Defendant also claims that the court erred in permitting the witness Virginia Cherry to testify that she had observed the sounds of defendant's trains prior to the collision and to state whether or not a whistle or bell was sounded on other occasions. Objection was made to this question, and apparently from the record no answer was given. However, we think the question was proper in view of the ruling of the court that it was admissible only to show the power

of observation of the witness and was not admitted as being material as to whether the train in question did or did not whistle on the night of the tragedy. This ruling is supported by the case of *St. Louis etc. R. R. Co.* v. *Mitchell,* 25 Tex. Civ. App. 197 [60 S. W. 891].

Counsel for appellants thoroughly tried the issues and ably submitted to this court every point that might be presented in support of their appeal, but we find no error in the record, and the judgment and the order should be affirmed. It is so ordered.

Thompson, J., and Steel, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 6, 1936, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 4, 1936.