[S. F. No. 13043. In Bank.—August 2, 1929.]

SADIE KOSTER et al., Respondents, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

Louis Oneal, Wm. F. James and Arthur G. Shoup for Appellants.

Rea & Caldwell and E. M. Rea for Respondents.

Wm. M. Conley, Philip Conley, Matthew Conley, Conley, Conley & Conley, F. de Journel and W. F. Cowan, *Amici Curiae*.

SEAWELL, J.—This appeal is taken from a judgment entered by the Superior Court of the county of Santa Clara upon the verdict of a jury awarding the plaintiffs $50,000 as and on account of damages alleged to have been sustained by them by reason of the death of Frank E. Koster, caused by a steam locomotive drawing a passenger train of eight cars, consisting of three diners, two coaches and three baggage-cars, owned and operated by the Southern Pacific Company, negligently colliding with the automobile driven and operated by said Frank E. Koster at a point on said company's railroad track where the same crosses Keyes Street, at right angles, in the city of San Jose. The road is operated as a commercial steam railroad. Judgment went against both defendants, Southern Pacific Company and its locomotive engineer in charge, Arthur R. Bullard. Sadie Koster is the widow and June and Alice Beverly Koster are minor children of said marriage, the latter being a posthumous child. The deceased at the time of his death was twenty-nine years of age, enjoying good health, and was engaged in the bakery business in the city of San Jose, which earned him $8,000 annually.

The collision occurred at about 4:29 A. M., June 18, 1926. Decedent died from injuries received in said collision some thirty or forty minutes thereafter. His brother, John Koster, a resident of the city of Oakland, whom decedent was attempting to convey to the Market Street station, where the former intended to take passage homeward on a Southern Pacific train departing from said station at 4:45 A. M., was also killed. Said Market Street station is about twenty-five blocks distant from the Keyes Street crossing, the place where the accident occurred.

The important question in this case is whether the decedent violated the rule of caution commonly known as the stop, look and listen rule, which is approved by a long line of decisions of this court, as well as by numerous courts of the land, both state and federal, in the light of all the facts and circumstances of the case presented, and thereby barred his heirs of the right to recover damages on account of his death. Other questions of importance affecting the conduct of decedent and the parties defendant are also present, but they are either subsidiary or relative to the main ques-

tion, first above stated. Whether the judgment may be sustained depends upon the conclusion which the law directs should be made upon a consideration of the facts which account for the injuries which were the proximate cause of Frank E. Koster's death. Some of the important facts are admitted and the others are so self-evident as to place their existence beyond the realm of serious doubt.

The general course of appellant's main tracks through the section of the city of San Jose where they cross Keyes Street is southerly and northerly and the course of said street is easterly and westerly. The train in question was the regular passenger train moving southerly.

Decedent, Frank E. Koster, resided with his family on Seventh Street, between Keyes and Bestor Streets, approximately three city blocks from the place of collision. It was the rule of decedent to leave his residence each morning between 4 and 5 o'clock for his place of business, which was located on Second Street. There is uncontradicted evidence in the record that he was seen to cross the railroad track at Keyes Street at the hours of 4 and 5 o'clock A. M. upon a number of occasions, and from its location with reference to his home and business, from which he made daily trips in his Nash sedan, and the nearness of his residence to said Keyes Street crossing, it must be assumed that he was quite familiar with said crossing and was aware that a passenger train, traveling southerly, crossed said street at about 4:22 o'clock A. M. each morning. The general course of appellant's main track through the section of the city of San Jose in which Keyes Street crossing is situated is on a straight line extending in a northerly and southerly direction.

So far as natural obstacles are concerned, there is nothing to obstruct the view of a person standing at a safe distance from the railroad track at said crossing from seeing a train of cars approaching from the north at a distance of at least 2,000 feet. The morning was clear and the atmospheric conditions for visibility were good. Although the sun rose at 4:48 A. M. on June 18, 1926, and it was practically daylight at 4:29 A. M., it was nevertheless the rule of the company defendant not to extinguish the headlight on the engine until the train arrived at a station some distance south

of said crossing. Said company's roadbed is built upon its private right of way on either side of said crossing, and no limitation is fixed by law as to the rate of speed said company's trains may travel, except when crossing streets within the limits of the city of San Jose. By an ordinance of said city it is provided that it shall be unlawful for any person, firm or corporation to operate a railroad train across the intersection of any street within the city limits of said city at a greater speed than 12 miles per hour, provided said ordinance shall not apply at the intersection of any streets where the person, firm or corporation operating or running trains or cars shall ''regularly maintain flagmen, gates or other mechanical devices for the protection of the public.'' The Company maintained a flagman at said intersection from 7 o'clock A. M. until 11 o'clock P. M. of each day. A notice to that effect was displayed upon the flag station building, which occupied a small space upon the company's right of way near the westerly line of entry upon said company's tracks. The usual standard cross-arm signal gave notice to the traveling public of a railroad crossing at a little distance beyond. The *locus quo* is near the city limits of said city of San Jose. No high buildings are constructed at said intersection, nor along the railroad company's right of way, in the section of the city we are here considering. By reason of the four corners of said intersection being occupied by factories or industrial plants, the traffic is reasonably extensive. Two of said plants at least, a brick manufacturing plant and the American Can Company, operate at night during the summer season, and were operating at the time the accident in question occurred. It is also in evidence that the boilers of the Ransome-Crummey Paving Company emitted steam, which added to the noise produced by the other two plants. Indeed, it is the claim of respondents that the noise at said intersection is always so great in the months of June, July, August and September as to prevent a person in a closed car from hearing an approaching train, or even its bell or whistle. Keyes Street is 60 feet in width, and the railroad right of way is approximately the same width at said point of intersection. The grade of the railroad approaching the intersection is slightly ascending. The northerly view of one proceeding westerly on Keyes Street, as was decedent, is continuously

obstructed by the American Can Company's building and a high board fence for the full distance of the block extending to the line of said railroad company's right of way. The watchman's shanty, so called, is a small building 8 feet high and $6\frac{1}{4} \times 6\frac{1}{4}$ feet. Said shanty is about 1 foot westerly from said board fence and sets back 10 feet from the northerly property line of Keyes Street. The small space between the shanty and fence was closed with boards. Accepting the contention of respondents, a continuous wall obstructs a northerly view of the main railroad track practically the whole distance of the block, abutting on Keyes Street and extending to the westerly line of the shanty. The shanty has a glass door facing southerly, which is on a line with a glass window looking northerly. While a person may see through said glass door and window, a very limited opportunity was afforded thereby for observing an approaching train at any point. At said intersection three tracks cross said Keyes Street, to wit, the main or central track, and two side-tracks, one on either side of the main-track. All tracks are standard gauge, 4 feet $8\frac{1}{2}$ inches between rails. The westerly side-track does not materially enter into the case. From the easterly side-track looking northerly after it passes the northerly property line of Keyes Street, a spur-track bears easterly. It is the claim of respondents that a box-car was spotted at a point on the side-track 10 feet north of the flagman's station in such a position with relation to the situation already described as to prolong the line of obstruction to the extent that no room was left for a person to sit in a car at a safe distance from the main-track and make observation as to whether a train from the north was approaching on the main line. The overhang of a box-car is $2\frac{1}{2}$ feet. The distance from the flagman's shanty to the side-track is 8 feet $3\frac{3}{4}$ inches. Said track is 4 feet $8\frac{1}{2}$ inches in width. The distance from the westerly rail of the side-track to the first rail of the main-track is 8 feet 6 inches. Eliminating the box-car from the side-track a traveler would have an open space of approximately 21 feet 6 inches in which to make observation for an approaching train. That a single box-car, 36 feet 10 inches in length and 9 feet 7 inches in width, should have obstructed the view of an approaching train, consisting of a steam locomotive, three diners, two

passenger coaches and three baggage-cars, throughout the entire open space of 21 feet 6 inches, seems improbable. A serious question is presented as to whether the box-car was in the position in which respondents would place it. If its position be changed from said position but a few feet either way the avenue of vision beyond the car is materially widened or narrowed. The claim as to its position being near the flagman's station may be seriously questioned, there being testimony from a number of apparently disinterested witnesses, whose attention was directed to the matter, that the box-car was from 80 to more than 100 feet north of Keyes Street. One of these witnesses, F. W. Reiff, the night watchman of the Pacific Coast Cannery plant, situated on the southwesterly corner of the intersection of said Keyes Street and the railroad crossing, testified that he made observation of the situation before and shortly after the collision and the tracks were clear except a box-car stood on the spur-track near the gate at the point where said track enters the American Can Company's property. This was a considerable distance north of the point where Police Officers Schwandt and Farley, who, in patrolling their beats, had occasion to pass over the tracks at 2:30 on the morning of the accident, placed the box-car. Both police officers testified that a box-car was spotted at a point beginning about 10 feet north of the flagman's shanty. Mr. Farley, who was the driver of the machine, stated on direct examination that no view of the track northerly was obtainable until the front wheels of the automobile had passed the east rail of the main-track. On cross-examination he stated that with the front wheels on the west rail of the side-track from the position the box-car was placed, as he saw the situation, he would say that one could have seen up the main-track for half the distance to the next crossing north, approximately 600 feet. This would indicate that the box-car was some considerable distance north of the flagman's shanty.

James B. Cushing, a street sweeper employed by the city of San Jose, crossed the intersection at 3:30 on the morning in question. He crossed the track going westerly very slowly operating the street-sweeping machine and when upon the side-track he was of the opinion that he was able to see 2,000 feet up the main-track. His view before reaching the

main-track was unobstructed. He saw lights at a northerly street intersection. The car, which is asserted to have been near the flagman's station, was placed much farther up the siding by the witness. Otherwise the tracks were clear.

Three witnesses, besides the members of the train crew, testified to hearing the whistle blow before the crossing was reached. Engineer Bullard testified that the bell was started ringing when the train pulled out of the main station at San Jose and was stopped by him after the engine had toppled to its side upon being derailed. The bell operated automatically by air pressure or power. The fireman set the bell in motion at the main San Jose station and it rang continuously through the suburbs of San Jose until it was turned off by the engineer, as above noted. Two whistle blasts, two long and two short, were given before crossing Martha station, the station immediately north of the crossing at Keyes Street. As to the blowing of the whistle at the several crossings, the engineer and fireman David were corroborated by the positive testimony of the train conductor, Conrad, Brakemen Dabbs and Bell and dining-car Chef McEllant of the train crew. These witnesses being inside the train did not notice that the bell was ringing, although one or two testified that it was set in motion at the main station. R. S. Risdon, foreman of the tin plate department of the American Can Company, testified that he was expecting a shipment of tin plate and was listening for the arrival of the freight train conveying the shipment. He heard the blasts of the passenger engine, which he located at the crossing first above Keyes Street. Very soon thereafter he heard a crash or unusual noise and went to the Keyes Street intersection. He testified that there was no car on the siding near the flagman's station, but there was a single car some distance up the track near the gate that leads into the American Can Company's property, as described by other witnesses. Frederick W. Reiff, the watchman heretofore mentioned, testified that he was upon the platform of the Pacific Coast Cannery Company at said crossing in the discharge of his duties and he saw the headlight of the engine when the train in question was at Reed Street crossing some 3,000 feet up the track and distinctly heard the blasts of the whistle at that distance. John Otto, the engineer for the Vernon-Clay plant, resided on Martha

Street near the main-track of the defendant company's railway. Martha Street crosses the track approximately 1300 feet north of Keyes Street. Otto testified that he was awakened on the morning of the accident by whistle blasts before the train reached Martha Street and heard the train afterward pass. He did not learn of the accident until about 6 o'clock that morning. The box-car at that time was about halfway between Martha and Keyes Streets.

We have made references to the testimony of the several witnesses offered by defendant as to whether or not the bell was rung and whistle blown for the reason that said testimony is affirmative or positive in character as to the actual occurrence of an event in question in contrast with the negative testimony of persons whose attention was not by reason of some special circumstance drawn to a commonplace event associated with the management of trains.

■ In an effort to demonstrate that a view of an approaching train was completely shut off by intervening obstacles to a person occupying the front seat of an automobile at any safe distance from the east rail of the main-track, respondents had reckoned with all possible elements that would tend to sustain their conclusion, such as widths of tracks, distances separating tracks, dimensions and overhang of box-cars and the position of physical objects and their relation to each other. The physical facts speak for themselves, and there is very small doubt that had decedent *stopped, looked and listened,* as the law required him to do, he would have been warned at a safe distance from the main track of the approach of said train and the hazard he would assume in attempting to cross the railroad crossing ahead of the train. The obstruction complained against consisted of a box-car approximately 30 feet in length by 6 feet in width at a point 10 feet northerly from a flagman's station house 8 feet high and 6 feet by 6 feet square. The train was moving up a slight grade under power and there were no other intervening objects except those in dispute to interfere with the usual warnings that a fuel-burning, steam-propelled train moving rapidly over its rails on a clear morning ordinarily gives of its approach. ■ Assuming that the obstructions existed as claimed by respondents, and that the noise at the intersection was so great as to overcome the noise made by the oncoming train,

these circumstances would not relieve. him of the duty of stopping, looking and listening, which, from the evidence, he undoubtedly failed to do. If upon stopping at a place. of safety near the railroad track he did not have a sufficient view of the situation looking both ways, it has been held by this court and other courts that the rule of caution required that he should alight from his automobile, go forward a few steps and take advantage of the view that would thus be afforded. (*Murray* v. *Southern Pac. Co.*, 177 Cal. 1 [169 Pac. 675]; *Thompson* v. *Southern Pac. Co.*, 31 Cal. App. 567 [161 Pac. 21]; *Baltimore & Ohio Ry. Co.* v. *Goodman*, 275 U. S. 66 [56 A. L. R. 645, 72 L. Ed. 167, 48 Sup. Ct. Rep. 24].)

The rule prescribing the *quantum* of caution that should be observed by persons crossing railroad tracks has been many times stated by this court without material deviation from the standard laid down in the case last above cited, written by Mr. Justice Holmes of the United States Supreme Court. The principle of law which governs that case is, in some respects, peculiarly applicable to the instant case. It is there said:

"Goodman was driving an automobile truck in an easterly direction and was killed by a train running southwesterly across the road at a rate of not less than 60 miles an hour. The line was straight, but it is said by the respondent that Goodman 'had no practical view,' beyond a section house 243 feet north of the crossing until he was about 20 feet from the first rail, or, as the respondent argues, 12 feet from danger, and that then the engine was still obscured by the section house. He had been driving at the rate of 10 or 12 miles an hour, but had cut down his rate to 5 or 6 miles at about 40 feet from the crossing. It is thought that there was an emergency in which, so far as appears, Goodman did all that he could.

"We do not go into further details as to Goodman's precise situation, beyond mentioning that it was daylight and that he was familiar with the crossing, for it appears to us plain that nothing is suggested by the evidence to relieve Goodman from responsibility for his own death. When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must

stop for the train, not the train stop for him. In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look. It seems to us that if he relies upon not hearing the train or any signal and takes no further precaution he does so at his own risk. If at the last moment Goodman found himself in an emergency it was his own fault that he did not reduce his speed earlier or come to a stop. It is true, as said in *Flannelly* v. *Delaware & H. Co.*, 225 U. S. 597, 603 [44 L. R. A. (N. S.) 154, 56 L. Ed. 1221, 1222, 32 Sup. Ct. Rep. 783], that the question of due care very generally is left to the jury. But we are dealing with a standard of conduct, and when the standard is clear it should be laid down once for all by the courts. See *Southern P. Co.* v. *Berkshire*, 254 U. S. 415, 419 [65 L. Ed. 335, 337, 338, 41 Sup. Ct. Rep. 162].''

The rule which was established in this state a number of years ago and which has been uniformly followed to and including the most recent decisions of this court and the District Court of Appeal is clearly stated in the familiar case of *Griffin* v. *San Pedro, Los Angeles & Salt Lake R. R. Co.*, 170 Cal. 772 [L. R. A. 1916A, 842, 151 Pac. 282]. We quote freely from that case for the reason that it distinguishes the cases usually cited, many of which respondents in the instant case rely upon, as holding that the question of negligence in cases of this class is practically in every case a question for the jury. A reasonable regard for time and space would not justify us in reproducing the review therein made of *Cooper* v. *Los Angeles Terminal Ry. Co.*, 137 Cal. 229 [70 Pac. 11]; *Bilton* v. *Southern Pacific Co.*, 148 Cal. 443 [83 Pac. 440]; *Antonian* v. *Southern Pac. Co.*, 9 Cal. App. 718 [100 Pac. 877]; *Eaton* v. *Southern Pacific Co.*, 22 Cal. App. 461 [134 Pac. 801]; *Martin* v. *Southern Pac. Co.*, 150 Cal. 124 [88 Pac. 701], and others. To this list might be added the more recent cases, *Green* v. *Southern Pac. Co.*, 53 Cal. App. 194 [199 Pac. 1059], *Gregg* v. *Western Pacific R. R. Co.*, 193 Cal. 212 [223 Pac. 553], and other cases decided since *Griffin* v. *San Pedro, Los Angeles & Salt Lake R. R. Co.*, *supra*. In all cases in which judgments have been upheld, either the injured party stopped, looked

and listened or took every opportunity to learn of the approach of the train that a cautious person should have taken in the circumstances of the situation. In practically all of said cases the stop, look and listen rule is expressly recognized. In restating the general rule in the Griffin case it is said:

 "A person approaching a railroad track, which is itself a warning of danger, must take advantage of every reasonable opportunity to look and listen. (*Holmes* v. *South. Pacific Ry. Co.*, 97 Cal. 167 [31 Pac. 834]; *Green* v. *Los Angeles etc. R. R. Co.*, 143 Cal. 37 [101 Am. St. Rep. 68, 76 Pac. 719]; *Hutson* v. *Southern Cal. Ry. Co.*, 150 Cal. 704 [89 Pac. 1093].) A traveler who is about to cross a railway track at a place where ordinarily the engineer gives appropriate signals of the approach of the train, may not depend upon such custom or even upon a duty, enjoined by law, to give such signals. 'He has no right not to look or listen because he has heard no such signals.' (*Erie Ry. Co.* v. *Kane*, 118 Fed. 234 [55 C. C. A. 129], cited in *Hutson* v. *Southern Cal. Ry. Co.*, 150 Cal. 704 [89 Pac. 1093].) The same doctrine is announced in *Herbert* v. *Southern Cal. Ry. Co.*, 121 Cal. 232 [53 Pac. 651] in which the negligence of the defendant in leaving open the safety gates at a crossing was not held to excuse plaintiff's failure to take any precautions in his attempt to cross the track. (See, also, *Heitman* v. *Pacific Electric Ry. Co.*, 10 Cal. App. 398 [102 Pac. 15]; *Wilkinson* v. *Oregon Short Line R. Co.*, 35 Utah, 110 [99 Pac. 466]; *Bates* v. *San Pedro, L. A. & S. L. R. Co.*, 38 Utah, 569 [114 Pac. 527].)"

The standard of conduct applicable to all persons upon approaching steam railroad crossings, as laid down in *Larrabee* v. *Western Pacific Ry. Co.*, 173 Cal. 743 [161· Pac. 750, 752], is applicable to the instant case in that it disposes of a number of points pressed by respondents. It is there said:

 "Nor is it true, as respondent argues, that the deceased's conduct, otherwise clearly negligent, is relieved from this reproach by virtue of his right to presume that the defendant would not run its train at an excessive rate of speed in approaching this crossing. Nor does the added circumstance that this was a special train in the slightest change the deceased's legal responsibilities. Railroads are entitled to operate special trains and to operate them at

high rates of speed. Their regular trains cannot be and no one expects them to be always on schedule. With all this the deceased was of course familiar. The statements in *Strong* v. *Sacramento & Placerville R. R. Co.*, 61 Cal. 326, and in *Whalen* v. *Arcata & Mad River Co.*, 92 Cal. 669 [28 Pac. 833], to the effect that the deceased had the right to rely upon the 'performance by those on the locomotive of every act imposed by law upon them when approaching a crossing,' cannot be considered to be the law of this state as affecting the rights and duties of one about to venture to make a railroad crossing. Such a one is not entitled to rely upon such a performance of duty so as to relieve him from the necessity of looking if he cannot see. Suffice it upon this to cite the later case of *Koch* v. *Southern Cal. Ry. Co.*, 148 Cal. 677, 680 [113 Am. St. Rep. 332, 7 Ann. Cas. 795, 4 L. R. A. (N. S.) 521, 84 Pac. 176]; *Griffin* v. *San Pedro, L. A. & Salt Lake R. R. Co.*, 170 Cal. 772 [L. R. A. 1916A, 842, 151 Pac. 282].''

It is conceded by appellants that the defendant company was guilty of negligence in running its train across said crossing at a greater rate of speed than 12 miles per hour as limited by city ordinance. On the other hand, it is claimed by appellants that decedent was guilty of negligence in attempting to drive across said crossing at a rate of speed in excess of the provisions of the Motor Vehicle Act (Stats. 1923, p. 517), which provides that the speed of motorists at railroad crossings shall not exceed 15 miles per hour.

The only surviving eye-witness to the accident was the fireman, John H. David, who was occupying a position on the left-hand side of the cab. The testimony of the train crew was that the train was traveling at a speed of 20 or 25 miles per hour. Respondents' contention is that the train, being seven minutes late and the speed limit commencing at Valbrick station and onward calling for a schedule of 50 miles per hour, the probabilities that this train was traveling at a much faster rate of speed than testified to by the train crew were strong. It is also argued that the distance the train ran before it was brought to a stop strongly supports their claim that the train was moving at the rate of 60 miles per hour at the time the collision occurred.

Fireman David testified that when the pilot of the engine was within 10 feet of the north property line of Keyes Street, decedent's automobile suddenly appeared coming from the east. The engine bell was automatically working. When he first saw the decedent he was back of the flagman's shanty. It was his judgment that the engine was nearer to the point where the automobile and engine struck than was the automobile, and from this circumstance he estimated the speed of the automobile at 30 or 40 miles per hour. The whole affair seemed like a flash. Upon first sight of decedent he called to the engineer to hold the train. The automobile became wedged in beneath the pilot and was carried, an entangled mass, the entire distance the engine and train traveled after the impact, which was 582 feet. The engine and first car became derailed at a distance of 358 feet and both traveled on the ties and ground for a distance of 224 feet, when the engine toppled partially to its side. The brakes and mechanism of the engine and train were in good condition, but the brakes failed to operate on the engine and first car after they became derailed.

A physician in the employ of the defendant company who called to attend the decedent at the hospital soon after the accident testified that the decedent, in response to an inquiry as to his name, replied, "It doesn't make any difference, it was all my fault; just give me something to put me out of my misery." Assuming that he made the statement and was conscious as to its effect, it was but a conclusion and we would not be bound by it if the facts and circumstances showed that he was not guilty of contributory negligence.

The respondent relies largely upon an indulgence of the presumption that the jury was at liberty to infer ordinary care and diligence on the part of the decedent from all of the circumstances of the case—his character and habits and the natural instincts of self-preservation—to hold the verdict. This can only be done in the absence of direct proof of the fact. The circumstances of the case alone are sufficient to rebut the presumption invoked. In *Herbert* v. *Southern Pac. Co.*, 121 Cal. 227 [53 Pac. 651], as to this issue it was said:

"But the cases arising from injuries suffered at railroad crossings have been so numerous, and upon certain points

there has been such absolute accord, that what will constitute ordinary care in such a case had been precisely defined, and, if *any* element is wanting, the courts will hold as matter of law that the plaintiff has been guilty of negligence. And, when injury results which might have been avoided by the use of proper care, the plaintiff cannot recover, although the defendant has also been guilty of negligence. In this special case the amount of care, as well as the nature of it, has been settled.

"The railroad track of a steam railway must itself be regarded as a sign of danger, and one intending to cross must avail himself of every opportunity to look and listen for approaching trains. What he must do in such a case will depend upon circumstances. If the view of the track is obstructed he should take greater pains to listen. If, taking these precautions, he would have seen or heard the approaching train, the very fact of injury will raise a presumption that he did not take the required precautions."

Again, in the case of *Pepper* v. *Southern Pac. Co.,* 105 Cal. 389 [38 Pac. 974, 976], it was said:

"If he could not see an approaching train because his vision was obstructed ordinary care for his own safety required him to stop in order that his hearing should not also be obstructed, and in any event to make his approach so slowly as to give him complete control, enabling him to stop instantly if occasion required."

If, as contended by respondents, the noise was so great at said crossing as to prevent a person seated in an inclosed car, as decedent was, from hearing the bell or whistle of a steam locomotive, it was negligence on the part of decedent, who had full knowledge of existing conditions, not to have stopped his motor and opened the door or windows of his car and listened, and if then, granting, for the sake of the illustration, his view was obstructed, he should not, as a prudent person, have attempted to cross unless he was well assured that it was safe to do so. As the court properly instructed the jury, it was incumbent upon him to use the care and caution commensurate with the apparent danger surrounding him when he approached a railroad crossing. If the unfortunate man had observed the rule of conduct which the law prescribed, he would not, in all human probability, have met an untimely death.

There can be no question that he did not exercise the care and caution required of him by the law of this state, and which was correctly stated in the following instruction:

"When such a one goes upon a railroad track, he knows he goes to a place where he may be killed, if the train comes upon him before he is clear of the track. He knows that he must stop for the train and not the train stop for him. In such circumstances, if a driver cannot be reasonably sure otherwise whether a train is dangerously near, he must stop, and get out of his automobile, and go forward on foot, to ascertain if a train is approaching."

Had he done so there can be no doubt that he could have observed the approaching train for a long way up the open track. ■ The decedent was accustomed to cross the intersection in question and undoubtedly was familiar with the fact that no watchman was on duty between 11 o'clock P. M. and 7 A. M. Ignorance of such fact, however, would not excuse the exercise of due care on his part in crossing the track. *Gregg* v. *Western Pac. R. R. Co.*, 193 Cal. 212 [223 Pac. 553], presents a case widely different from the instant case on the facts.

From what we have said it becomes unnecessary to discuss the other instructions or the other points made by appellants. We are satisfied that the failure of decedent to observe the standard of care plainly laid down in numerous decisions of this court and other courts of the land bars the right of respondents to recover in the circumstances of the collision.

Judgment reversed.

Richards, J., Waste, C. J., Shenk, J., and Curtis, J., concurred.

Langdon, J., dissented.

Rehearing denied.

Langdon, J., dissented.