[L. A. No. 9986. In Bank.—December 10, 1929.]

DOROTHY M. YOUNG et al., Appellants, v. PACIFIC ELECTRIC RAILWAY COMPANY (a Corporation) et al., Respondents.

Ben. F. Griffith and Ralph W. Eckhardt for Appellants.

Frank Karr, E. E. Morris and C. W. Cornell for Respondents.

Robert Brennan, M. W. Reed, E. T. Lucey, Leo E. Sievert and H. K. Lockwood, *Amici Curiae* for Atchison, Topeka and Santa Fe Railway Company.

W. I. Gilbert and Kenneth Keeper, *Amici Curiae* for Southern Pacific Company.

E. E. Bennett and Harry B. Ellison, *Amici Curiae* for Los Angeles and Salt Lake Railroad Company.

THE COURT.—Plaintiffs, as the heirs of Peter W. Young, brought this action to recover damages for his death, resulting from a collision at a crossing between an automobile truck, driven by him, and an electric car of the defendant Pacific Electric Railway Company, operated by the defendant motorman, Howard T. Bennett. Negligence of the defendants was charged in three particulars: In failing to give a proper crossing signal; operating the car at an excessive speed, and in failing to operate the car with due care in view of the dangerous and unguarded condition of the crossing. The case was tried with a jury. When all the evidence was in, defendants moved for a directed verdict in their favor on the following grounds: (1) That the evidence showed conclusively that there was no negligence on the part of the railway company which contributed, directly or proximately, to the happening of the accident; (2) that the evidence conclusively showed that the deceased was himself guilty of contributory negligence, and (3) that if, under the evidence, the jury returned a verdict in favor of the plaintiffs, the court would have to set it aside because of the insufficiency of the evidence to support it. The court granted the motion without indicating upon what grounds

it did so. Plaintiffs' motion for a new trial was denied, and they have appealed from the judgment entered on the directed verdict.

The trial court erred in taking the case from the jury unless it can be said, as a matter of law, that no other reasonable conclusion, than that defendants were entitled to judgment, was legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that an appellate court would be impelled to reverse it upon appeal, or a trial court to set it aside. (*Umsted* v. *Scofield Eng. Const. Co.*, 203 Cal. 224, 228 [263 Pac. 799]; *Duggan* v. *Forderer*, 79 Cal. App. 339, 343 [249 Pac. 533].) It becomes necessary, therefore, to determine whether the evidence in the case tended to establish the negligence charged by the plaintiffs to the defendants, or whether the testimony, as a whole, so conclusively supported one or more of the grounds of defendants' motion for a directed verdict that the court would have been under compulsion to set aside a contrary finding of the jury.

The collision which occasioned Young's death occurred on December 22, 1925, in the city of Hawthorne, where Eucalyptus Avenue intersects at right angles the main line track of the Pacific Electric Railway Company running east and west. Evidence as to the condition of the crossing showed that a warehouse was located on the northwest corner. North of the warehouse, on Eucalyptus Avenue, was a garage, with a house adjoining on the north. These buildings obstructed the view of persons driving in a southerly direction along Eucalyptus Avenue to such an extent that they had no opportunity to observe an east-bound electric car until they were almost on, or dangerously close to the tracks. The obstructions likewise prevented the trainmen on cars approaching the crossing from the west from seeing automobiles southbound toward the tracks. In addition to the buildings, box-cars stood on the siding west of Eucalyptus Avenue and north of the main track practically all the time. A power line pole west of the avenue and between the two tracks also obstructed the view from a certain angle. There was the usual standard railroad crossing sign, but no automatic signaling device nor gates, nor was a flagman stationed at the intersection to warn travelers of approaching cars. One of plaintiffs' witnesses testified that

on several occasions he had discussed with the agent of the Pacific Electric Railway Company at El Segundo the dangerous nature of the crossing, and had suggested that a wigwag be installed. While the respondents assert that an examination of their exhibits will show the locality to be "a sparsely settled rural community with the standard cross-arm plainly visible," nevertheless the crossing is a well-traveled one within the city limits of Hawthorne, a witness testifying that he "would estimate, including [his] customers and others driving touring cars, inclusive of [his] own trucks, about two hundred people" daily crossed the tracks at Eucalyptus Avenue.

■ Plaintiffs' first assignment of negligence on the part of the defendants concerns the alleged failure of the motorman to blow the whistle sufficiently in advance of reaching the crossing to give proper warning. There was a substantial conflict in the testimony as to the time of giving the signals, and as to their extent. The fact that there was positive testimony on the subject does not conclusively establish that the required crossing signals were given. It creates merely a conflict of testimony to be resolved by the jury. (*Thompson* v. *Los Angeles etc. R. Co.*, 165 Cal. 748, 752 [134 Pac. 709]; *Vaca* v. *Southern Pac. Co.*, 91 Cal. App. 470, 475 [267 Pac. 346]; see, also, *Marchetti* v. *Southern Pac. Co.*, 204 Cal 679 [269 Pac. 529, 531].)

With reference to the alleged excessive speed of the car, respondents contend that, in the absence of a regulatory statute or ordinance, a railway company may ordinarily run its trains at such speed as it sees fit, and that a charge of negligence cannot be predicated on that rate of speed unless there are attendant circumstances which make such speed negligence. They also cite authorities as to the right of a railroad company to operate its trains at a high rate of speed in country districts. ■ While it is true that no rate of speed is negligence *per se* in the absence of a statute or ordinance, it does not follow that a railroad company will be permitted to run its trains under all conditions at any rate of speed it may choose. It must regulate its speed with proper regard for the safety of human life and property, especially when running through towns and cities. The character of a crossing, it has been well reasoned, affects the duty of the railroad company toward travelers

upon the public highway, and its trains must pass over dangerous crossings at a less rate of speed proportionate to the danger. As previously stated, the scene of the collision was not the ordinary country grade crossing, but a well-traveled, paved avenue within the city limits. It was stipulated that the distance between Hawthorne and El Segundo, the termini of the portion of the electric line involved in this case, was 4.56 miles. Estimates as to the speed of the car varied from twelve to twenty miles an hour, and there was some evidence that the train was coasting. While the defendant motorman testified that his car was traveling about fifteen miles an hour as he approached the intersection, he further stated that the running time between the two termini mentioned, with seven scheduled stops, was eleven minutes. A brief computation will demonstrate that the car would have to average a trifle less than twenty-five miles an hour in order to keep within the allotted running time, without making any allowance for the slackening of the car before stopping, and without any deduction for the time actually lost in taking on passengers. Eucalyptus Avenue was not one of the scheduled stops, and it would be only reasonable for the jury to infer that, in order to keep within the scheduled running time, the train would travel faster where there were no regular stations than it would when nearing one where it was required to stop. ■ "A rate of speed that may be allowable in a thinly settled part of the country, where but few persons will have occasion to cross the tracks, may be so dangerous as to constitute negligence on the part of the railroad company when driving a train through a city or village, where many persons are likely to cross the track." (2 Thompson on Negligence, sec. 1875.) As the standard of duty shifts with the circumstances developed in the case, the question whether or not a rate of speed is excessive is one of fact for the jury. As this court said in *Bilton v. Southern Pac. Co.*, 148 Cal. 443, 447 [83 Pac. 440]: " . . . there can be no doubt that the question as to whether or not a rate of speed at a crossing is so dangerous or excessive as to constitute negligence must depend upon the particular circumstances there existing, and if the circumstances are such that reasonable and impartial men may well differ as to whether the speed maintained

at the particular place showed a want of reasonable care, the question as to whether the railroad company was guilty of negligence in maintaining such speed is one for the jury'' (citing authorities). (See, also, *Marchetti* v. *Southern Pac. Co., supra; Tousley* v. *Pacific Elec. Ry. Co.,* 166 Cal. 457, 460 [137 Pac. 31].)

The third charge of negligence against the defendants relates to the failure to operate the car with due care in view of the dangerous condition of the crossing. A witness testified that there was practically a solid wall of obstruction commencing with the house north of the garage and continuing up to within nineteen feet, six or eight inches of the track, and that there was no opportunity at all, until one passed the latter point, to see a car coming from the west. According to the testimony of the motorman, ''a box-car was located on the siding just north of the track that [he] was operating on, approximately 40 feet west of Eucalyptus avenue.'' He first saw the truck as he came out from behind the box-car, and about thirty-five feet from the crossing. There was also testimony showing that if a box-car was stopped in a position to load on the platform on the south side of the Sanderson warehouse, an automobile would have to be beyond the siding tracks to see a train coming from the west. A witness was asked whether, under those conditions, in an automobile in which the driver's point of vision was seven feet back of the front of his car (as was the case with the autotruck involved in this collision), the driver could see a train approaching from the west—west of the telephone pole—without putting himself ''in a position of peril.'' ''The Court: What do you mean by 'a position of peril'?'' ''Counsel for Plaintiffs: By 'a position of peril' I mean a position where you would be so far on the track that if a car came down there it would strike the automobile in which you were.'' ''The Witness: It would not strike me, but it would strike the automobile, for the reason that I would have to have at least my radiator and the center of my front wheels on the track.'' In *Bilton* v. *Southern Pac. Co., supra,* this court said (p. 447 of 148 Cal.) : ''The obligation rested upon it [the railroad company] of taking such care to prevent injury by its trains to those passing over the crossing as would, under the existing circumstances, be reasonable, and if the view

of its track was so obstructed that a person lawfully using the street could not before passing from a place of safety to a place of danger see an approaching train just beyond the obstruction in time to escape it, if it moved at a high rate of speed, it was its duty to moderate the speed accordingly, or make the approach of the train reasonably apparent by other methods to the user of the street.''

*Marchetti* v. *Southern Pac. Co., supra,* was an action for damages for death caused by a collision. The court granted defendants' motion for a nonsuit based on the contributory negligence of the deceased. There, as here, the evidence showed the crossing to be dangerous because of existing obstructions, and there was a conflict as to the sounding of proper warnings. On appeal the respondents contended that, even though it should be held there was error on the part of the trial court in granting their motion on the ground of contributory negligence, the order should be sustained because there was no evidence of negligence on their part in the operation of their train at the time of the collision. In passing upon this contention, this court said: ''It was held in *Green* v. *Southern Pac. Co.,* 53 Cal. App. 194, 202 [199 Pac. 1059, 1062], that the law imposed 'upon a railroad company the duty to use reasonable care, corresponding to the circumstances constituting the probable danger, to avoid injury to persons lawfully traveling upon the public highway crossed by the company's tracks and trains. It then becomes a question for the jury to decide whether or not it was negligence for the company to run its cars across the highway without providing a flagman or some means of warning to travelers at the place of crossing. And where the facts in evidence prove that usually or frequently there are obstructions which interfere with the opportunity to see moving trains while travelers on the highway are approaching a muchly-traveled crossing, it cannot be held that as a matter of law it is not negligence to run trains there without warning signals other than those usually given by engines or cars.' '' We thus arrive at the conclusion that the plaintiff, upon the issue of the defendants' negligence, was entitled to have the case go to the jury.

We are thus brought to a consideration of the question as to whether upon the practically undisputed evi-

dence in the case the deceased must be held to have been guilty of such contributory negligence, as a matter of law, proximately causing his death, as would have justified the trial court in granting the defendants' motion for a directed verdict in their favor upon that ground. The uncontradicted evidence in the case discloses that the deceased was a man of good health and in the prime of life, and that he was, and for several months prior to the casualty which resulted in his death had been, engaged in the business of selling and distributing bottled water, in the conduct of which he used the small truck which he was driving just before the collision, and that the territory which he served with his product lay upon both sides of the railroad, and included Eucalyptus Avenue. It must be concluded, therefore, that he was familiar with the crossing where the collision occurred. The evidence as to the rate of speed at which the decedent customarily crossed the railroad track was conflicting and there is also some conflict in the evidence as to the rate of speed at which the deceased was driving on Eucalyptus Avenue immediately before the collision occurred. There is, however, no conflict in the statement of several eye-witnesses, whose testimony is unimpeached, as to the action and conduct of the deceased in approaching the crossing upon this final and tragic occasion, and from this evidence it appears conclusively that from the place where he was first observed by these witnesses, and which varied from 45 to 150 feet from the crossing, the deceased was driving his truck, holding its steering-wheel with his left hand, and looking down toward the seat or into the body of his car, his right arm and hand being extended in that direction, but whether to lay hold of an emergency brake or to do some other act does not appear. These witnesses agree that while the deceased was thus within their observation he did not stop and did not look in the direction of the crossing or of the approaching train until he had reached a point well within the danger zone and within a few feet of the crossing. In the presence of this positive and unimpeached testimony it is clear that there was in this case no room for the application of the presumption set forth in subdivision 4 of section 1963 of the Code of Civil Procedure ''that a

person takes ordinary care of his own concerns.'' When the deceased had thus reached a point a few feet from the crossing, without stopping, without looking, and apparently without listening, for the sight or sound of an approaching train, a section foreman, who was observing his approach and who testified that the deceased ''wasn't looking where he was going,'' called loudly to him and immediately called again; whereupon the deceased ''looked up and he got ahold of his wheel and steering his car turned his car the same way the Pacific Electric car was running.'' He was too late, however, ·to fully avoid a collision, and while his machine did not quite reach the rails, some portion of the over-hang of the electric car struck the forward part of it, and by the force of the impact the deceased was thrown from his car and killed. The appellants herein urge that in view of the foregoing evidence the jury might have concluded that the deceased in thus approaching the crossing in question might have had his right hand upon the emergency brake of his car preparatory to stopping it before reaching the track and that by the loud shouts of the section foreman he was so far distracted from such possible purpose as to conceive the idea that by suddenly turning his car to the left he might avoid a collision, and that but for such distraction, he would have stopped his car in time to escape injury. This reasoning, however, does not rise above the dignity of mere conjecture and cannot be held to work an avoidance of the duty which the deceased owed to his own safety to stop and look and listen upon approaching a railroad crossing, which is always a sign of danger, and which in this instance was rendered even more so by the obstructions to clear vision which were along or at the time upon the railroad right of way. This court has had frequent and recent occasion to define the duty of persons approaching in vehicles railroad crossings similar to that existing in this case and similarly obscured, and in each of these cases this court has uniformly held that the conduct of persons thus approaching such crossings without stopping, looking or listening for approaching trains amounted to contributory negligence, as a matter of law, which would prevent the recovery by themselves, or, in the event of their death, by their personal representatives, in

the event of a consequent casualty. (*Griffin* v. *San Pedro etc. R. R. Co.*, 170 Cal. 772 [L. R. A. 1916A, 842, 151 Pac. 282]; *Murray* v. *Southern Pac. Co.*, 177 Cal. 1 [169 Pac. 675]; *Billig* v. *Southern Pac. Co.*, 192 Cal. 357 [219 Pac. 992]; *Parker* v. *Southern Pac. Co.*, 204 Cal. 609 [269 Pac. 622]; *California Rendering Co.* v. *Pacific Elec. Ry. Co.*, 205 Cal. 73 [269 Pac. 922]; *Koster* v. *Southern Pac. Co.*, 207 Cal. 753 [279 Pac. 788].)

We are constrained, therefore, to hold, after a full consideration of the facts of this case and of the law applicable thereto, that the action of the trial court in granting the defendants' motion for a directed verdict and in instructing the jury to return such verdict in the defendants' favor must be upheld. The judgment rendered upon such verdict is accordingly affirmed.