## SOUTHERN PAC. CO. v. DAY (two cases). No. 5995. *

Circuit Court of Appeals, Ninth Circuit. March 10, 1930.

*Rehearing denied May 26, 1930.

W. I. Gilbert, of Los Angeles, Cal., for appellant.

Bertrand J. Wellman, of Los Angeles, Cal., for appellee.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge.

These actions were brought to recover for damages resulting from an accident at a railroad crossing at Camarillo, Ventura county, Cal. The actions were tried together. In one action Clark Day sought to recover for personal injuries suffered by him, and a verdict and judgment in that action were rendered for the sum of $10,000. In the other action, brought by Clark Day as administrator of the estate of his deceased wife, the verdict and judgment were for $20,000 damages.

The accident occurred about 10:10 a. m. on the 24th of April, 1927. It was Sunday morning and a bright clear day. Plaintiff was operating a closed Willys-Knight automobile of the sedan type. As he approached the crossing where the accident occurred, he found the street obstructed by a north-bound passenger train standing on the passing track, one of the four tracks crossing the intersection. Three other automobiles were already standing in line in the street waiting for the track to clear. The plaintiff drew up alongside the forward automobile with his front wheels so far in advance of that automobile that his body was about even with the front wheels thereof. Other cars followed and formed a third line, and before the track was cleared about fifteen cars, three lines abreast and five deep, were standing waiting the opportunity to cross the tracks. The crossing was protected by the usual signboards and also by a wigwag signal to the right and slightly to the rear of plaintiff's position in his car. The plaintiff testified concerning the situation as follows:

"And after we waited about a minute and a half, the train started out very slowly at first and then it kept increasing its speed, and just before the hind end of the train crossed the boulevard, the wigwag stopped and I heard the bell stop ringing. I looked at it to be sure it was stopping and it was completely stopped. The hind end of the train had not, at that time, completely cleared the crossing. I waited until the train had got clear across the crossing and I looked as far as I could to see whether the crossing was clear and I observed on the other side of the crossing, before I started, there was some box cars sitting there. I looked behind this train to my left and I looked as far as I could and I saw there was box cars sitting on the first track and this train passing out on the second track. I saw box cars across the track from where this train was pulling out, which appeared to be the track next to the one the train was on that was pulling out. The front end of my car was right almost on the first track. I had pulled up there to stop. It was possibly a foot or two from the first track, on the boulevard. I started my car up in low gear and started to cross and there was not any sound or warning of any train or bell ringing at all, and I looked down the track to my right to see that there was not any train—second section following this train that went out—and I woke up in the hospital.

"Q. State if you know whether that was a single tracked road there, main line road, or double track, at that time. A. I knew there was only a single tracked line.

"The Court: Did you know which was the main line of these four tracks? A. Well, it appeared to me that this train was on the main line.

"The Court: Did you know there were four tracks there? A. I did not.

"The Court: Did you know, of the tracks that you could see, which the main line track was? A. I did not definitely know. I just figured that this track the train was on was the main line.

"The Court: By what? A. I could see the box cars standing there and the box cars on the track next to me, and I thought the train pulling out was on the main line. * * * I have been across this crossing before; possibly three or four times. I never stopped to count the number of tracks there; I have stopped but not to count the rails; I didn't stop to count them. I did stop and looked forward but I couldn't tell you there were four tracks. I got the idea that certain of them were main line and certain of them were passing tracks because I rode over the road myself. I never did see a train on the passing track; but I saw it on the day of the accident. I also saw another track beyond the passing track. I did say that there were some box cars over there, so that I did know that there were two tracks, but I didn't know whether it was the fourth track or not, although I saw a track over there. I couldn't tell that it was two tracks in between. I did look. I did know that a through train was not going to go through on the track that the box cars were on. I knew it was not going on the second track because the train was on that track.

"Q. There were two tracks out of the question, weren't there? A. Yes.

"Q. That closer to you there was another track that you had to go across? A. Yes, it had box cars there.

"Q. So that you knew of three tracks, beyond any question? A. Yes, All three of those tracks had something on them to keep a through train out; I could see that. I did know it when I started across. * * * I did not see immediately ahead of me a track next to the one on which the train was that had blocked me; I didn't notice any. I looked across to my left angle and this train went out on the main line, presumably to me. I did start across that track that the train was on that had blocked me. I did not see the track ahead of me on which was the train coming that hit me, because as this train pulled out and as it cleared about 35 feet I looked to an angle to the left; I could see the box cars sitting over there and I had it in my mind that those box cars were sitting right against this track that the train pulled out on and I looked to my right to see that there was no second section following this train that pulled out, and I woke up in the hospital. As I looked and located those box cars I must have looked right straight across the main line but I don't remember it. I have been back there since. * * * After the train pulled out I listened to see if I could hear the bell on any other engine. I looked down the track as far as I could look to my left. That was to the rear end of the train and then I looked across to the box cars.

"Q. When you got past the rear end of the train that was pulling out didn't you look to your left to see if there was anything in that direction? A. The train was on that track.

"Q. I asked you when you got past the rear end of the train that was pulling out did you or did you not look to your left to see if there was a train coming? A. I never did get past there because I was struck before I did.

"Q. You don't mean to tell the jury that you were on the track that the train was on that was pulling out, when you were struck? A. Yes; the front end of my car was struck. I was driving a Willys-Knight sedan. I suppose it is about six feet from the back end of my seat to the hood. The front end of my car was struck before I got from behind the other train; that is just about right. I was behind the train that was pulling out at the time the front end of my automobile was struck by the other train; that's my recollection. I have never measured the overhang of the train over the track the train was on that struck me. Passing between two trains there is some 18 to 24 inches, I believe, between two trains passing. When I was hit I had just shoved into second gear and was going about ten miles an hour; eight or ten miles an hour. I don't know how that figures out in seconds. I did not get clear off the track; I just got close enough for the engine to strike the front end of my automobile."

It is a fundamental and well-established rule governing the conduct of a person attempting to cross railroad tracks at their intersection with highways that the railroad track itself is a sign of danger, and that he must look for approaching trains where and when looking would be effective for the prevention of a collision. The plaintiff looked and saw a train obstructing the highway, and stopped, but, when he again started to cross the tracks, he was then and thereafter required to maintain the vigilance which the situation demanded of him. A part of that vigilance was looking in both directions before crossing a railroad track on which a train might be approaching at such time and in such manner that he would be able to prevent a collision if, as the re-

sult of his observation, a train was seen to be approaching. Baltimore & Ohio Ry. Co. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645. In the absence of the stoppage of the wigwag, it would not be contended, we believe, that plaintiff could recover under these circumstances testified to by him, and the trial court, in ruling upon the motion for directed verdict, was evidently of that opinion. It was the fatal and, unfortunately, unjustifiable assumption by the plaintiff that the outgoing train was on the main track that induced him to go forward without due observation toward his left for a train approaching therefrom. The railroad track itself is a sign of danger to be heeded at the peril of the traveler on the intersecting highway. This rule is applicable to each track. Plaintiff says he did not see this track at all, although it was within a few feet of him. He assumed that the third track he was about to cross was the one occupied by the standing freight cars which he observed as they were disclosed to his vision by the moving outgoing train. If it is negligence not to heed the warning of a track where the opportunity is afforded one who stops near thereto, it certainly must be negligence not to see the track at all when it is clearly and plainly visible. The railroad track was as much a warning signal as the crossing sign or the wigwag, and as readily visible to one advancing slowly toward the track. He was confirmed in his impressions that there was no danger in crossing, of course, by the fact, if it be a fact, and we must assume it was, that the wigwag stopped just before he started forward. In measuring his conduct, however, it must be observed that as soon as he started across he was no longer in a position to be warned by the wigwag, which was thereafter behind him, and, if it again commenced to operate, he would not be further warned thereby, and could not rely thereon in determining his future course of action. So far as he was concerned, it passed out of the picture as soon as he settled down in a driving position and started his car forward. In this connection it should be stated that the engineer of the train that struck the plaintiff's car testified that he looked at the wigwag at the time of the accident, and that it was working, and that a witness on the opposite side of the track testified that as the train on the passing track cleared his view of the wigwag it was working and continued to operate, and the occupant of an automobile in the rear of plaintiff's car testified that the wigwag was operating continuously before and after

the outgoing train began to move and until the accident.

It was also testified that the wigwag was in good order when inspected the day before and also immediately thereafter. Assigning full credence to the testimony of the plaintiff and his young daughter, at most it proves that the wigwag hesitated or stopped for a few seconds, and the other affirmative testimony shows that it again began to operate before the accident. This would fix the time of stoppage as two and one-half seconds, or less, being the time required by the plaintiff's machine, operating at an average speed of five miles per hour, a distance of eighteen feet to the point of danger, and collision. It is clear that the plaintiff expected the wigwag to stop as the outgoing train cleared the crossing, and the momentary stoppage of the wigwag confirmed an erroneous impression which had already been confirmed or induced by the fact that the wigwag was working while the train was standing still. But this erroneous assumption would at once have been corrected by observing the main line track immediately beyond the moving outgoing train, which it was the clear duty of the plaintiff to see. If plaintiff was unfamiliar with the situation at the crossing, that is, as to the number of the tracks and as to which track was the passing track and which the main track, such track itself was nevertheless a notice of danger to be apprehended from trains operating thereon, and required him to make the necessary observations to protect himself on any theory as to its possible use as he approached to cross it. If, on the other hand, he was so familiar with the crossing that he knew that the third track he was to cross was the main track, his momentary assumption to the contrary was thus of course wholly unjustified, and must have resulted from forgetfulness. In either event, the track which was immediately in front of him in plain sight was a warning of danger, which required him to take precautions for his own safety fixed by the law. This he neglected to do. Young v. So. Pac. Co., 182 Cal. 369, 190 P. 36, 40.

The result in this case was exactly the same as though, when he looked at the wigwag, and noted that it had stopped, he at once closed his eyes and went blindly forward. If he had actually done so, his negligence would have been obvious, but his car entered upon the pathway of a train approaching on the main track without any opportunity on his part to protect himself from an approaching train, as his view there-

of was obstructed by the outgoing train. The legal effect is exactly the same as though he had trusted wholly and exclusively to the temporary failure of the wigwag to operate, and had not looked at all before crossing the main track. The rule is that the negligence of the railroad company in failing to give crossing signals required by law does not justify the person crossing the track in omitting precautions which would otherwise be required of him, and this rule would apply with equal force to a fault of the wigwag if the railroad company was not negligent. One of these requirements is that he shall look effectively up and down the track he is about to cross. In Hutson v. Southern Cal. Ry. Co., 150 Cal. 701, 89 P. 1093, this question was squarely presented to the Supreme Court of California by an instruction which, in stating the duty of the person about to cross the track, informed the jury that in listening for the approaching train he had a right to assume that the whistle would be blown or the bell rung, as required by law. This instruction was held erroneous in so far as it restricted the traveler's obligation or modified it because of the failure of the affirmative duty of the railroad company to give warning of the approach of the train.

In the case of Young v. So. Pac. Co., supra, the plaintiff approached the railway track when his view was obscured by a part of a train standing on the passing track. In that condition the court instructed the jury in effect that the presence of this train obstructing his view modified the rule to stop, look, and listen. The court, in commenting upon this instruction, stated:

"This could only mean, under the circumstances, that the deceased was not required to stop, look, and listen if in the opinion of the jury the appearance of the box car upon the passing track was sufficient in their judgment to excuse him from the burden of the rule. This is not the law. The deceased was under the obligation to look and listen, and if by reason of the obstruction caused by the box car he could not see or hear without stopping in a place of safety so to do, it was his duty to do so."

See, also, Koster v. Southern Pacific Co. (Cal. Sup.) 279 P. 788.

In the case where protective gates were raised as the plaintiff was standing at the crossing waiting an opportunity to cross, the Supreme Court of Massachusetts, in Ellis v. Boston, etc., R. R., 169 Mass. 600, 48 N. E. 839, 840, stated:

"While the raising of the gates justified the plaintiff in attempting to cross when he did, and while that fact and the facts that no whistle was sounded and no bell was rung are to be taken into consideration on the question of how much he must himself look and observe as he makes his way across, these circumstances do not excuse him from looking and listening and taking thought for his own safety. He cannot rely wholly upon them, and cannot recover without showing more, as to his own conduct, than that he so relied."

The rule was quoted with approval in Koch v. So. Cal. Ry. Co., 148 Cal. 680, 84 P. 176, 4 L. R. A. (N. S.) 521, 113 Am. St. Rep. 332, 7 Ann. Cas. 795; and in Gregg v. Western Pac. R. Co., 193 Cal. 212, 223, 223 P. 553. See, also, Koster v. Southern Pac. Co. (Cal. Sup.) 279 P. 788.

■ The judgment in favor of the plaintiff, Clark Day, for his personal injuries must be reversed. The court instructed the jury that his negligence, or that of his wife, would bar a recovery in the action for her death. We hold that he was negligent as a matter of law. The court also instructed the jury that, in the action for her death "to bar a recovery for contributory negligence the now deceased wife must be shown to have participated in the negligent acts of her husband," or to have been guilty of independent negligence. These instructions were conflicting. The jury held that neither were negligent. Unless the negligence of the husband is imputed to the wife as a matter of law, the question of her negligence must be left to the jury. In cases of personal injuries to the wife, it has been held in California that the husband's negligence will defeat a recovery therefor because the amount recovered would be community property, Giorgetti v. Wollaston, 83 Cal. App. 358, 257 P. 109; Power v. Crown Stage Co., 82 Cal. App. 660, 256 P. 457; Basler v. Sacramento Gas & Elec. Co., 158 Cal. 518, 111 P. 530, Ann. Cas. 1912A, 642, and this seems to be conceded to be the rule; but it is claimed that the recovery here would be in favor of the heirs, and that therefore the interest of the husband is only partial, and thus the recovery only barred by his negligence to the extent of his interest. This point is not discussed by the appellant, and only thus briefly stated by the appellees. We can see no difficulty in requiring the jury on a new trial to confine its finding of damage to the injury sustained by the children, although the cause of action has been held to be a single cause in favor of all the heirs. See

Estate of Riccomi, 185 Cal. 458, 197 P. 97, 14 A. L. R. 509; Rabe v. Western Union Tel. Co., 198 Cal. 290, 244 P. 1077. In view of our conclusion, it is unnecessary to express an opinion upon the question of the defendant's negligence.

Judgment reversed.

RUDKIN, Circuit Judge, sat in the hearing of this case, but does not participate in the decision.